AMOCO TRANSPORT CO., Plaintiff,

v.

S/S MASON LYKES, et al., Defendants.

Civ. A. Nos. G–80–97, G–80–304 and G–81–221.

United States District Court,
S.D. Texas,
Galveston Division.

Nov. 16, 1982.

John R. Pearson, Clann & Pearson and John K. Meyer, Hinds & Meyer, Houston, Tex., for plaintiff cargo interests.

Joseph Newton, Eastham, Watson, Dale & Forney, Houston, Tex., for Amoco Transport Co.

Samuel B. Kent, Royston, Rayzor, Vickery & Williams, Galveston, Tex., for S/S Mason Lykes and Lykes Bros. Steamship Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.

GIBSON, District Judge.

This consolidated action arises out of the collision of the M/V AMOCO CREMONA and the S/S MASON LYKES on April 2, 1980. The claim and counterclaim of the vessels were settled prior to the commencement of trial. The remaining claims are those of the cargo interests aboard the MASON LYKES against both vessels for the freight expenses they incurred as a result of the collision. The cargo was not physically harmed, but the MASON LYKES was significantly damaged. Consequently, its owner and operator, Lykes Brothers Steamship Co. [Lykes], opted to abandon the voyage and claimed under its bills of lading that freight was earned. Cargo interests allege that the carrier did not earn the freight it collected because the abandonment was improper. In addition to the original freight, the cargo interests were forced to pay another freight to Lykes to reach their final ports in the Far East.

Upon review of the evidence and applicable law, the Court concludes that the freight expenses are not recoverable against either defendant. Accordingly, the Court makes the following findings of fact and conclusions of law:

### II.

1. At all material times, Amoco Transport Company [Amoco] was owner and operator of the M/V AMOCO CREMONA, a tank ship 789 feet in length, 118 feet in breadth, with a capacity of 72,814 deadweight tons, powered by a 18,600 h.p. diesel engine, and having a standard sea speed of 13 knots.

2. At all material times, Lykes was the owner and operator of the S/S MASON LYKES, a cargo ship 540 feet in length, 76 feet in breadth, with a deadweight capacity of 14,660 tons, powered by a steam engine of 12,500 horsepower and having a standard sea speed of 21 knots.

3. The AMOCO CREMONA was outbound from Galveston and piloted by a local pilot. The vessel had just discharged its cargo of light crude oil.

4. The MASON LYKES on voyage 50 was inbound to Galveston from its originating point, New Orleans, Louisiana. The vessel was carrying 2,300 tons of general cargo manifested for the Far East. It was coming to Galveston to load additional cargo.

5. The bills of lading covering cargo loaded in New Orleans had two clauses of particular interest. Clause 10 allows the vessel to deviate from its voyage and/or abandon its cargo, and states, in pertinent part, the following:

Clause 10. In any situation whatsoever and wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the Carrier is likely to give rise to risk of capture, seizure, detention, damage, delay or disadvantage to or loss of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to commence or continue the voyage, the Carrier may before or after loading, ... proceed or return, directly or indirectly, to or stop at any port or place whatsoever as the master or the Carrier may consider safe or advisable under the circumstances, and there discharge the goods; ... such discharge shall constitute complete delivery under this contract and the Carrier shall be freed from any further responsibility.

Clause 16 contains a guaranteed freight agreement and states, in pertinent part, the following:

[F]ull freight hereunder to port of discharge named herein shall be considered *completely earned on shipment* whether the freight be stated or intended to be prepaid or to be collected at destination; and the Carrier shall be entitled to all

freight and charges due hereunder, whether actually paid or not, and to receive and retain them irrevocably under all circumstances whatsoever *ship and/or cargo lost or not lost or the voyage broken up or abandoned.*

6. The vessels were approaching the sea buoy which marks the division between the Gulf of Mexico and the Galveston Channel. Near that point, vessels either take on or let off local pilots who captain the vessels within the Galveston Channel. AMOCO CREMONA let off its pilot at 4:12 a.m., and the MASON LYKES estimated to take on its pilot by 4:45 a.m.

As the vessels neared each other, the seas were slight, the wind light, and visibility poor (½ mile) due to fog. Some drizzle had been reported.

7. As soon as the AMOCO CREMONA let off its pilot and set a course of 134°, the ship's master, Stefano Caiolo, and a second mate observed on the port and starboard radar systems the MASON LYKES at about 5° to 10° port. Caiolo determined that the distance between the two vessels, seven to eight miles, was too close and ordered the course changed to 140°. The vessel was moving at a slow ahead speed, having been set at dead slow ahead when the pilot was left off. The 140° heading was reached about ten minutes later (4:22 a.m.). At that time, the MASON LYKES was called over channel 16 of the VHF, but no response was heard.

Caiolo determined that the AMOCO CREMONA might be in some danger on the 140° heading because of the speed and direction of the MASON LYKES although it appeared that the MASON LYKES would pass on AMOCO CREMONA's port side. Consequently, he ordered the course changed to 160° and speed increased to half-ahead. This course change took seven minutes to complete (4:29 a.m.). During the change, at about 4:25 a.m., the AMOCO CREMONA attempted to contact the MASON LYKES again, but to no avail.

At 4:29 a.m., collision appeared imminent. Caiolo ordered hard starboard full ahead, but the collision could not be avoided and was logged at 4:32 a.m.

During the encounter with the MASON LYKES, no AMOCO CREMONA crewmember was on watch on the bow lookout because Caiolo felt that with the radar operating and because of the limited visibility a lookout would serve no purpose.

Just prior to the collision, the lights on the MASON LYKES came into view from the port wing of the AMOCO CREMONA. Caiolo sounded one long blast immediately prior to the sighting and a series of short blasts afterward.

8. As the MASON LYKES approached the AMOCO CREMONA, it traveled at approximately 14 knots. Its first course was 308°. The MASON LYKES's chief officer, Henry G. Guice, was advised of three vessels leaving Galveston. When the AMOCO CREMONA came into view on radar at a range of about two and a half miles, Guice ordered a course change to 300° and later to 295°. As the AMOCO CREMONA neared the MASON LYKES, Guice ordered a hard port turn, engine full astern. Realizing he was in error, he attempted to countermand the order but the vessel would not respond and the collision resulted.

During these movements of the MASON LYKES, no radar plots were made. Guice assumed that the AMOCO CREMONA was leaving Galveston the same way he was coming in and would pass the MASON LYKES on the starboard side. He had heard the AMOCO CREMONA's emergency blast and had answered.

9. All parties agree that the actions of the MASON LYKES crew were "unbelievably stupid," as plaintiffs' expert, Captain Richard Patterson, testified. Due to the lack of visibility, both the speed and direction of the MASON LYKES were the result of negligent navigation of MASON LYKES crewmen. The Court finds that the vessel was traveling too fast and its port course was exceedingly dangerous, violations of navigational rules. In addition, the crew was negligent in not adequately plotting the position of the AMOCO CREMONA, another rule violation. Such navi-

gational negligence presumptively caused the collision and consequent damages.

10. The Court also finds that the crew of the AMOCO CREMONA was slightly negligent in not clearly and decisively changing course so that its direction would be obvious on the MASON LYKES radar screen. The Court agrees with Captain Patterson's assessment that the AMOCO CREMONA's course changes—6° and then 20° at the speed undertaken—were insufficient to comply with the navigational rules. Guice's testimony reveals his own belief that the AMOCO CREMONA would pass to his starboard. In sum, in light of the direction of the MASON LYKES and the lack of visibility, Caiolo should have ordered the AMOCO CREMONA to move more decisively starboard. The Court finds this act was a violation of the navigational rules and a cause of the collision.

Moreover, no crewman was posted on the bow of the AMOCO CREMONA to watch for other vessels. This failure to have a man stand watch is also a violation of a navigational rule and presumptively a cause of the collision.

Regarding the alleged failure of the AMOCO CREMONA to plot the position of the MASON LYKES, the Court finds that the AMOCO CREMONA crew did adequately plot the MASON LYKES' position. The AMOCO CREMONA crew knew the direction of the MASON LYKES and attempted to avoid the ensuing collision by going further starboard. Captain Patterson noted that to make a thorough radar plot, the AMOCO CREMONA needed to remain in a constant direction. The Court finds that this action appears in conflict with the recommended avoiding action.

Regarding the alleged failure of the AMOCO CREMONA to communicate with the MASON LYKES, the Court finds that the AMOCO CREMONA attempted to call twice but received no response. The Court finds no negligence on the part of the AMOCO CREMONA's crew concerning its attempt to communicate with the MASON LYKES.

11. In sum, the Court finds that navigational negligence was committed by the crews of both vessels and apportions it as follows: MASON LYKES, 90%; AMOCO CREMONA, 10%.

12. Following the collision, Lykes Bros. through its vice-president of the maintenance and repair division, Joseph Bernstein, immediately began to find out the extent of the damage and what repairs would be necessary. The vessel, although minus her anchors, could move under her own power. With the assistance of tugboats, she was taken into the Port of Galveston on either April 3 or 4. By April 10 a formal field survey of the damage prepared by Tom McKenzie, manager of Lykes in Houston, and his group of engineers was submitted to Bernstein. This survey was used to bid the repair work competitively. Prior to the completion of the field survey, McKenzie had described orally and in detail the nature and extent of the damage. From this oral report, Bernstein figured that repairs would take about "60 days in a rather large shipyard." Bernstein deposition at 34.

Prior to receiving any bids on the repair work and prior to the writing of the field survey, Lykes convened a meeting on April 4 or 5 to determine what course the company would take. Bernstein gave his opinion about the damage and repair time. Some time thereafter Lykes decided to abandon the voyage, formally approved by Robert J. Brennan, executive vice-president, who had attended the meeting. Due to the extent of damage, Lykes decided to off-load the cargo in Galveston. Cargo discharge began April 7 and lasted until 11:00 a.m. on April 10. When Lykes had actually decided to abandon the voyage is unclear, but a formal letter of abandonment to the 23 cargo interests was dated April 8. *See* plaintiffs' exhibit 20. Lykes also declared freight earned.

The decision to abandon resulted from the projected repair delay of 55–60 days. Lykes deemed the delay "unreasonable" for the cargo interests involved. For both the New Orleans and Galveston cargo, Lykes believed that abandonment would afford an

opportunity to make other shipping arrangements. In addition, Lykes was worried about the expense and possible hazard of securing the cargo for a 60-day period. Lykes did not seek advice from, nor was any given by the cargo interests because of the number of shippers and consignees involved.

Before voyage 50 had commenced, the MASON LYKES had been committed on a time charter to the Military Sealift Command. To meet the requirements of the charter party, the vessel was equipped with a particular communications system in March 1980. The MASON LYKES had to commence its charter activities by June 19–29. If the MASON LYKES had not been available for chartering service, Lykes probably could have been able to substitute a similar vessel, as Lykes had done on other occasions. Brennan stated that the charter party agreement would not have "altered anything with respect to doing the repairs on the ship." Brennan deposition at 76. Confident of substituting another vessel if necessary, Brennan was not concerned about the charter commitment when voyage 50 was abandoned.

On April 10 the field survey was released to the three shipyards interested in performing the repairs—Todd Shipyard in Galveston, Texas; Ingalls Shipbuilding Co. in Pascagoula, Mississippi; and Newport News Shipbuilding and Dry Dock Co. in Newport News, Virginia. Bids were opened on April 12. Todd offered completion by June 16 for about $2,149,000. Ingalls offered completion by June 16 for about $2,859,000. Newport News offered either completion in 28 calendar days for $1,806,249 or completion by May 29 for $1,668,000. Lykes chose the last proposal on April 12 because of economic reasons.

The MASON LYKES departed Galveston at 6:00 p.m. on April 12 and arrived in Newport News in the evening of April 17. Although promised by May 29, the vessel was not repaired until June 14, 57 days after its arrival in the shipyard. Thereafter, the vessel worked under government charter.

13. The Court finds that, under the circumstances existing at the time of the decision, Lykes' decision to abandon was reasonable. First, the extensive damage to the MASON LYKES precluded it from continuing its voyage without substantial repair. Bernstein's opinion that repairs might take 55 to 60 days was proved accurate by the bids from Todd and Ingalls and by the actual time spent at the Newport News facility. Certainly Lykes may rely on the opinion of its experienced vice-president in charge of repair. Second, it acted promptly but not hastily in making its decision. Waiting for the field survey would not have changed the result because it was merely a more detailed report of McKenzie's oral observations. Freeing all cargo interests—those already on board and those waiting to be lifted—was reasonable because of the length of time involved and the potential warehousing problems. Moreover, the large number of cargo interests excuses Lykes' lack of contact with them prior to announcing the abandonment. In addition, Lykes cannot be faulted for choosing the least expensive bid which offered a completion date sooner than those of Todd and of Ingalls. Finally, the Court notes that the charter party did not factor into this decision. In sum, the carrier acted reasonably when it abandoned and, thus, was entitled to its freight guaranteed under clause 16 of the bill of lading.

14. After voyage 50 was abandoned, the cargo interests had to look for other means of getting their cargo to the Far East. Shipment was arranged through Lykes Bros. Most cargo was placed on the HOWELL LYKES about a month after the abandonment; the rest on the ZOELLA LYKES which departed on June 6.

15. The Court finds that all parties plaintiff are the proper parties to this lawsuit. They are all the shippers, consignees, or owners of the cargo, or their subrogated underwriters, who were required and did pay both freights necessary to ship the cargo.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this admiralty case pursuant to 28 U.S.C. § 1333(1).

■ 2. Various navigational rules and statutes govern the conduct of vessels as they traverse navigable waters. In order to promote the adherence of these rules and hopefully the avoidance of collisions, the Supreme Court has ruled that if it is shown that a rule or statute has been violated, then the offending party has the burden of showing that the violation of the rule or statute *could* not have caused the collision. *The PENNSYLVANIA,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

■ 3. The crew of the MASON LYKES was at fault in the following respects:

A. They failed to plot the radar observations, a violation of rules 5 and 7(a) & (b). 33 U.S.C. foll. § 1602.

B. They proceeded at an unsafe speed under the circumstances, a violation of rules 6 & 19(b). 33 U.S.C. foll. § 1602.

C. They changed the MASON LYKES' course to port when the AMOCO CREMONA was forward of the MASON LYKES' beam, a violation of 19(d)(i). 33 U.S.C. foll. § 1602.

■ 4. The crew of the AMOCO CREMONA was at fault in the following respects:

A. They failed to place a crewman on watch on the forward bow, a violation of rule 5. 33 U.S.C. foll. § 1602.

B. They did not adequately take avoiding action because the AMOCO CREMONA's course was not readily apparent to the other vessel, the MASON LYKES, a violation of rules 19(d) and 8(b) & (c). 33 U.S.C. foll. § 1602.

5. These violations are presumed to have caused and contributed to the collision. The Court finds that the presumptions raised were not rebutted and, consequently, the Court finds that these violations were causes of the collision.

■ 6. Having found that Amoco is partially at fault, the Court must decide whether the damages sought by the cargo interests are assessable against Amoco. If the non-carrying vessel is partially negligent, cargo may seek all its physical damages from that vessel. *The ATLAS,* 93 U.S. 302, 23 L.Ed. 863 (1876). The non-carrying vessel then can turn to the carrying vessel for the contribution up to its share of the proportionate negligence. *The CHATTAHOOCHEE,* 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899); *Allied Chemical Corp. v. Hess Tankship Co. of Delaware,* 661 F.2d 1044, 1058 (5th Cir.1981). In this case, however, the cargo was not damaged. The cargo interests seek recovery from Amoco for the freight charges they paid to Lykes.

7. The Supreme Court in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) set out the general rule that "a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong." *Id.* at 309, 48 S.Ct. at 135. In *Robins Dry Dock,* time charterers of a steamship sought recovery for their loss of use of the vessel against a dry dock company which had damaged the vessel while it was being serviced by the dry dock. The Court held that the time charterers were barred from recovery because defendant's tort injured only the propeller, which belonged to the owner; plaintiffs' loss resulted from defendant's negligent interference with their charter. *Id.* at 308–09, 48 S.Ct. at 135.

The Fifth Circuit was upheld consistently the *Robins* rule. *See, e.g., Vicksburg Towing & Mississippi Marine Transport,* 609 F.2d 176 (5th Cir.1980); *Louisville & Nashville Railroad Co. v. The Tug M/V BAYOU LACOMBE,* 597 F.2d 469 (5th Cir.1979); *Dick Meyers Towing Service, Inc. v. United States of America,* 577 F.2d 1023 (5th Cir. 1978) (per curiam), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). The appellate court has emphasized that the "critical factor in applying *Robins* is 'the

character of the interest harmed.'" *Louisville & Nashville Railroad Co., supra* at 473 (quoting *Dick Meyers, supra* at 1025). These cases have generally involved physical damage to a structure, such as a lock or bridge, owned by one party, and non-physical damages, such as loss of the use of the structure or interference with contractual rights, suffered by a non-owning third party.

The Supreme Court distinguished *Robins* in *Aktieselskabet Cuzco v. THE SUCARSECO,* 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942 (1935). In that case, the Court required a negligent non-carrying vessel to pay for the share of a general average that cargo had to bear under the bill of lading's Jason clause. The Court stated that general average expenses were assessable against cargo because cargo participated in a common adventure with the carrying vessel. *Id.* at 403–04, 55 S.Ct. at 470–71. The general average expenses covered those damages directly attributable to the physical damage of the ship. As the Court explained, "The 'Jason Clause' merely distributed a loss for which [the non-carrying vessel] was responsible and in that view that cargo owners are entitled to recover that part of the loss which they have sustained." *Id.* at 405, 55 S.Ct. at 471. Thus, the loss, unlike that in *Robins* and its progeny, was not separate and distinct from the physical harm, instead it was the physical harm suffered by cargo as a common adventurer in the voyage.

■ 8. This Court finds that the facts in this case fall under the *Robins* rule and, not the rule in *THE SUCARSECO.* Amoco's negligent act physically damaged the MASON LYKES but not its cargo. Although cargo could have been injured and was in jeopardy during the collision, *see THE SUCARSECO, supra* at 405, 55 S.Ct. at 471; *J. Ray McDermott & Co. v. S.S. EGERO,* 453 F.2d 1202, 1203, (5th Cir.1972), its damages—additional freight charges—arose because the MASON LYKES became inoperable, the voyage was abandoned, and Lykes Bros. invoked the freight-earned clause in the bill of lading. These damages are economic losses not associated with physical damages; thus, they are analogous to the additional expenses vessels might incur if a channel they used was blocked after a vessel negligently allided with a buoy and sank. *See Kingston Shipping Co. v. Roberts,* 667 F.2d 34 (11th Cir.1982) (per curiam), *U.S. app. pend.* In sum, plaintiffs may not recover their non-economic losses from Amoco.

9. Alternatively, cargo interests seek the additional freight from Lykes. The Court finds this expense is not recoverable because Lykes reasonably abandoned the voyage.

■ 10. Generally, in the absence of a contractual provision otherwise, freight is earned only upon safe delivery of the cargo carried. *See Alcoa Steamship Co. v. United States,* 338 U.S. 421, 422, 70 S.Ct. 190, 191, 94 L.Ed. 225 (1949). However, if the parties agree by contract, freight may be considered "guaranteed" regardless of delivery. *See Hirsch Lumber Co. v. Weyerhaeuser Steamship Co.,* 233 F.2d 791, 794 (2d Cir. 1956) *cert. denied,* 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956); *In re Compania Naviera Epsilon, S.A.,* 1974 A.M.C. 2608, 2621 (S.D.N.Y.1973). The Supreme Court has approved of such clauses in bills of lading. *See Alcoa Steamship, supra* 338 U.S. at 422, 70 S.Ct. at 191; *Allanwilde Corp. v. Vacuum Oil Co.,* 248 U.S. 377, 385–86, 39 S.Ct. 147, 148–49, 63 L.Ed. 312 (1919); *International Paper Co. v. The Schooner "GRACIE D. CHAMBERS",* 248 U.S. 387, 391–92, 39 S.Ct. 149, 150, 63 L.Ed. 318 (1919).

■ 11. The guaranteed freight clauses and other exculpatory clauses contained in bills of lading are not absolute licenses although they may be liberally worded. Carriers are required to exercise "reasoned judgment" under the circumstances existing and reasonably foreseeable at the time the decision is made. *See THE MALCOLM BAXTER, JR.,* 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901 (1928) (voyage abandoned due to embargo; freight earned); *THE STYRIA v. Morgan,* 186 U.S. 1, 22 S.Ct. 731, 46 L.Ed. 1027 (1902) (bill of lading contemplated circumstances of war thus ex-

cusing the reasonable decision of the vessel's master to off-load the cargo before reaching destination); *T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 629 F.2d 338, 343, 367–79 (5th Cir.1980) (carrier acted reasonably in loading cargo on first two days of loading but not third and, thus, was due proportional freight even through ship never sailed, as per bill of lading); *Orient Mid-East Lines, Inc. v. Cooperative for American Relief Everywhere, Inc.*, 410 F.2d 1006 (D.C.Cir.1969) ("second freights" clause in bill of lading not invokable because carrier did not exercise reasoned judgment); *De la Rama S.S. Co. v. Ellis*, 149 F.2d 61 (9th Cir.), *cert. denied*, 326 U.S. 718, 66 S.Ct. 23, 90 L.Ed. 425 (1945) (freight earned on shipment although voyage was abandoned and cargo unloaded due to bombing of Pearl Harbor); *American Foreign S.S. Corp. v. Amtorg Trading Corp.*, 133 F.2d 765 (9th Cir.), *cert. denied*, 319 U.S. 771, 63 S.Ct. 1436, 87 L.Ed. 1719 (1943) (bill of lading authorized carrier's abandonment, which was justified because of the carrier's reasonable actions in light of military occurrences). The reasonableness of a carrier's decision is a factual determination subject to a "clearly erroneous" standard. *T.J. Stevenson, supra* at 378.

 In appraising the reasonableness of a carrier's decision, courts have noted which information was relayed to the carrier, which information it gathered, whether the carrier sought instruction from the shipper, and whether the shipper instructed the carrier. *See T.J. Stevenson, supra* at 378 (infestation of flour learned before third day of loading, and shipper not contacted regarding continued loading); *De la Rama S.S. Co., supra* at 64–65 (unclear news regarding gravity of Pearl Harbor and lack of instructions from shipper); *American Foreign S.S. Corp., supra* at 768–71 (extensive newspaper accounts of blockade and carrier's own efforts to obtain official information).

 12. While a "forced abandonment" justifies a carrier's claim for freight—*see, e.g., De la Rama S.S. Co., supra* at 63–64 (government requisitioned vessel and ordered cargo discharged)—abandonment caused by a carrier's own fault is not excusable. *See Merchants Corp. of America v. 9,655 Long Tons, More or Less of No. 2 Yellow Milo*, 238 F.Supp. 572 (S.D. Tex.1965) ("[V]oyage ... frustrated due to the fault of the shipowner in permitting the occurrence of conditions giving rise to a libel and then in failing to preserve the financial integrity of the vessel to such an extent as to enable it to remove the libel by bond or otherwise." *Id.* at 574); *Silva v. Bankers Commercial Corp.*, 163 F.2d 602, 607 (2d Cir.1947) (carrier unable "to obtain sufficient cargo and freights to render the voyage" of the vessel profitable); *Kelly v. Steamship LOUISE*, 58 F.Supp. 445, 448 (D.Md.1945) (unseaworthy condition due to "gross negligence of the shipowner").

As noted above, the prepaid or guaranteed freight clause is a risk-sharing device, which requires a shipper to assume "to some extent the inherent risks of ocean transportation attributable to uncontrollable events such as perils of sea, acts of God, and restraint of princes." *Merchants Corp. of America, supra* at 574. *See also De la Rama, supra* at 64. A shipowner's fault which creates an undesirable situation is within the shipowner's control and, thus, not excusable.

▪ However, the fault of the shipowner's employees in the navigation or in the management of the vessel is not an event for which the carrier should be held responsible. Section 1304(2)(a) of the Carriage of Goods by Sea Act, exonerates the ship and carrier from loss due to navigational error. *See Wilbur-Ellis Co. v. M/V CAPTAYANNIS "S"*, 451 F.2d 973, 974 (9th Cir.1971) (per curiam), *cert. denied*, 405 U.S. 923, 92 S.Ct. 962, 30 L.Ed.2d 794 (1972); *Isbrandtsen Co. v. Federal Ins. Co.*, 113 F.Supp. 357, 358 (S.D.N.Y.1952) (the Act's exemption is "unconditional"). In a case similar to this one, where a vessel was stranded resulting in the loss of the vessel as well as part of her cargo, a district court awarded the carrier its freight charges in spite of the negligent navigation which caused the stranding. *In re Compania Nav-*

*iera Epsilon, supra.* The court held that barring the freight charge guaranteed in the bill of lading because of the crew's negligent navigation would result in conclusion that is "essentially at war with COGSA's policy and, therefore, unacceptable." *Id.* This Court agrees. COGSA allocates risks between shipper and carrier. The seaworthiness of a vessel is a status the carrier can control and is, therefore, held responsible for. *See* 46 U.S.C. § 1304(1). Uncontrollable causes of loss, such as acts of God or war and navigational error, are not the carrier's or the ship's responsibility. *See generally* § 1304(2)(a). Thus, this Court finds that barring the carrier from its guaranteed freight because of the navigational negligence of its employees would be in conflict with the desired goal of COGSA.

14. As discussed above in the findings of fact, the Court has found that the employees of the defendants, the S/S MASON LYKES and Lykes Brothers Steamship Co., Inc., were negligent in navigating the cargo vessel. This navigational negligence in concert with the slight navigational negligence committed by the employees of Amoco Transport Co. on the AMOCO CREMONA caused the collision. Thus, because of the navigational negligence of its employees, Lykes Bros. as carrier was put into a position of having to decide if voyage 50 would continue. This negligence does not bar Lykes Bros. from claiming its earned freight upon the abandonment.

█ The only constraint placed on the decision to abandon is the judicially-imposed requirement that it be reasonable at the time it is made. As discussed above in the findings of fact, the Court has found the decision to abandon reasonable in light of all the circumstances at the time it was made. Hence, Lykes Bros. is entitled to retain the freight it collected under the freight earned clause in the bill of lading.

15. In conclusion, the Court finds that the cargo interests may not collect its freight charges from either vessel. These damages are not assessable against AMOCO because of the *Robins Dry Dock* rule. As against Lykes, the freight earned under the

bills of lading was retained properly because Lykes' abandonment of the voyage was reasonable. Thus, plaintiffs shall recover nothing from the vessels.

16. If any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. If any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.