768 F.2d 659
 1986 A.M.C. 563
 AMOCO TRANSPORT COMPANY, Plaintiff-Appellee,
v.
S/S MASON LYKES, etc., et al., Defendants-Appellees,
v.
CUMBERLAND MARKETING INTERNATIONAL, INC., et al.,
Intervenors-Appellants.
NORTHWESTERN NATIONAL INSURANCE COMPANY, Plaintiff-Appellant,
v.
AMOCO TRANSPORT CO., etc., Defendant Third-Party Plaintiff-Appellee,
Lykes Bros. Steamship Co., Inc., Third-Party Defendant-Appellee.
CHINA STEEL CORPORATION, Plaintiff-Appellant,
v.
M/V MASON LYKES, etc., et al., Defendants-Appellees.
 No. 83-2219.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 16, 1985.
 
 John K. Meyer, Houston, Tex., for Cumberland, Buhrke, Harnischfeger, Hyundai & China Steel.
 John Eric Olson, New York City, for China Steel.
 John R. Pearson, Houston, Tex., and Donald M. Waesche, New York City, for Northwestern & Tokio.
 Joseph Newton, Houston, Tex., for Amoco.
 Samuel B. Kent, Galveston, Tex., for S/S Mason Lykes & Lykes Bros.
 Appeal from the United States District Court for the Southern District of Texas.
 Before CLARK, Chief Judge, RUBIN and POLITZ, Circuit Judges.
 POLITZ, Circuit Judge:
 
 
 1
 The owners and insurers of cargo aboard the S/S MASON LYKES appeal the judgment of the district court, 550 F.Supp. 1264, denying recovery for a duplication of freight charges incurred as a result of a collision between the S/S MASON LYKES and the M/V AMOCO CREMONA. Concluding that the cargo interests have asserted valid claims against both Lykes Bros. Steamship Co., Inc. and Amoco Transport Co., we reverse and remand.
 
 Facts
 
 2
 On April 1, 1980, the MASON LYKES left New Orleans with a partial load of cargo, bound for the Far East with intermediate stops in Galveston and Houston to complete loading. The next morning, in a dense fog, as the MASON LYKES neared the sea buoy to the Galveston Channel, the outbound AMOCO CREMONA appeared on her radar screen. MASON LYKES' chief officer ordered a slight change of course, but the path of the AMOCO CREMONA was not plotted on radar. Simultaneously, when the MASON LYKES appeared on the AMOCO CREMONA's radar, her master likewise ordered a slight change of course. When a collision became apparent, the master of the AMOCO CREMONA first called for a 20? change of course and then commanded an emergency hard starboard, full ahead. In the meantime, the MASON LYKES was thrown into hard port, full astern. Before the officer on the MASON LYKES could countermand his erroneous order, his vessel's stern struck and penetrated the hull of the AMOCO CREMONA, port-forward.
 
 
 3
 The trial court found both vessels at fault, assigning 90% of the responsibility for the accident to the MASON LYKES and 10% to the AMOCO CREMONA. Both vessels sustained extensive damages. The MASON LYKES limped into the Port of Galveston, aided by tugs, and an immediate damage survey was done. Based on the initial oral reports of damages, Lykes estimated that repairs to the MASON LYKES would take 60 days. Without waiting for a full field survey or consulting with the cargo owners, Lykes unilaterally determined that a 60-day delay would be considered unreasonable by the cargo interests and decided to abandon the voyage under clause 10 of the bill of lading.[1]
 
 
 4
 Although the cargo was put in jeopardy by the collision, it was not physically damaged. It was unloaded at Galveston approximately a week after the collision and reshipped aboard another Lykes vessel a month later.[2] Because the bills of lading contained a "freight earned clause,"[3] the full freight was charged for the original voyage to the Far East even though the cargo was discharged at Galveston. The cargo owners had to pay a second full freight charge to secure shipment of their goods from Galveston to the Far East and filed suit against the owners of both the MASON LYKES and and the AMOCO CREMONA for recovery of the second payment. They also asserted their claims by way of intervention in an action between Lykes and Amoco. The suits were consolidated. All claims between Amoco and Lykes were settled; only the claims of the cargo interests remained for trial. Those claims were decided by the district court adverse to cargo and are now before this court.
 
 
 5
 Recovery from Lykes Bros.: The Decision to Abandon Voyage
 
 
 6
 and Retain Freight
 
 
 7
 One of the basic principles of American maritime law is that "ocean carrier freight charges are not earned unless and until the goods are delivered to destination." Alcoa Steamship Co. v. United States, 338 U.S. 421, 422, 70 S.Ct. 190, 191, 94 L.Ed. 225 (1949). Parties are free, however, to agree that freight will be considered earned upon loading, regardless of whether the cargo is ever actually delivered to its final destination. Id. But such "freight earned clauses" do not give the carrier an unqualified right to abandon the voyage and retain the freight.
 
 
 8
 In deciding to abandon the voyage, the carrier has a duty to exercise reasoned judgment, having due regard for the interests of the cargo, and "must endeavor to hold the balance evenly between ship and cargo when their interests conflict." The Steamship STYRIA v. Morgan, 186 U.S. 1, 9, 22 S.Ct. 731, 734, 46 L.Ed. 1027 (1902). See also T.J. Stevenson & Co. v. 81,193 Bags of Flour, 629 F.2d 338 (5th Cir.1980); Orient Mid East Lines, Inc. v. Cooperative For A.R.E., Inc., 410 F.2d 1006 (D.C.Cir.1969). Factors to be considered in the evaluation of the reasonableness of the carrier's decision to terminate the voyage and retain the freight include:
 
 
 9
 (1) the information available to the carrier at the time the decision to abandon was made;
 
 
 10
 (2) efforts by the carrier to obtain additional reliable information upon which to base the decision;
 
 
 11
 (3) efforts by the carrier to contact the shippers for instructions;
 
 
 12
 (4) the presence or absence of instructions from the shippers;
 
 
 13
 (5) whether the circumstances suggesting abandonment are the result of fault on the part of the carrier;[4] and(6) whether it is possible to complete the voyage either on the current vessel or upon another vessel (albeit with additional expense to the carrier).
 
 
 14
 T.J. Stevenson & Co. v. 81,193 Bags of Flour; De La Rama S.S. Co. v. Ellis, 149 F.2d 61 (9th Cir.), cert. denied, 326 U.S. 718, 66 S.Ct. 23, 90 L.Ed. 425 (1945); The WILDWOOD, 133 F.2d 765 (9th Cir.), cert. denied, 319 U.S. 771, 63 S.Ct. 1436, 87 L.Ed. 1719 (1943); Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp., 306 F.2d 188 (9th Cir.1962); Silva v. Bankers Commercial Corp., 163 F.2d 602 (2d Cir.1947); Merchants Corp. of America v. 9655 Long Tons, No. 2 Yellow Milo, 238 F.Supp. 572 (S.D.Tex.1965); The CHRISTOS, 1966 A.M.C. 1455 (D.D.C.1965); The LOUISE, 58 F.Supp. 445 (D.Md.1945).
 
 
 15
 The trial judge found that Lykes' decision to abandon the voyage of the MASON LYKES was reasonable and that it was entitled to retain the freight as earned under clause 16 of the bill of lading. The determination that such a decision is reasonable involves a mixed question of fact and law, triggering broad appellate review.[5]
 
 
 16
 When the MASON LYKES collided with the AMOCO CREMONA she was loaded with 2,352 tons of cargo that had been lifted in the port of New Orleans. An additional 4,000 tons were to be loaded in the ports of Galveston and Houston. After the collision it was obvious that the MASON LYKES could not continue the voyage without repairs, and she was towed into the port of Galveston where the Lykes' maintenance and repair division immediately began to survey the damage. During the first week in April, a field representative of Lykes orally informed its vice president of maintenance and repair that the entire bow area back to the number one cargo hold was twisted, fractured, and open to the sea. The representative also reported extensive damage to the fo'c'sle deck and anchors and a fracture in the hull which was admitting water into the bow thruster and machinery space. Based upon this oral report, the vice president of maintenance and repair estimated that repairs would take approximately 60 days in a large shipyard. Shortly thereafter, he gave this estimate to other members of the Lykes management who were meeting to discuss the effect of the damage on the voyage. In the meantime, a formal field survey of the damage was undertaken and the maintenance and repair division began contacting shipyards to determine their availability and interest.
 
 
 17
 Lykes began unloading the cargo from the MASON LYKES at 6:00 a.m. on April 5. By April 8 at the latest,[6] a formal decision to abandon the voyage and retain the freight was made, and a letter to that effect was sent to all cargo interests. The letter offered to book the cargo on the HOWELL LYKES, which was scheduled to call at Galveston on April 25, but informed the cargo owners that a second full freight would be charged for the continuation of the voyage on that vessel. This letter was Lykes' first attempt to contact the cargo owners after the collision. No attempt was made to determine whether the cargo owners would consider the estimated 60-day repair time unreasonable, or to obtain instructions from the cargo owners regarding disposition of their cargo before unloading commenced. Although one cargo owner inquired about the possibility of leaving his cargo aboard the MASON LYKES for delivery after repairs, Lykes stated that its letter was a formal abandonment which did not give cargo the option of shipping aboard the MASON LYKES after the repairs were completed without paying a second freight. The unloading was concluded on April 10 and the cargo was stored in Galveston at the risk and expense of the cargo owners.
 
 
 18
 On April 10, the field survey was completed and bid specifications were distributed. Lykes received three bids which it opened on April 12. All three bids contemplated completion by at least mid-June when Lykes was obligated to deliver the MASON LYKES to the Military Sea Lift Command under the terms of a charter that had been executed several months before. Two of the bids promised completion of repairs by June 16, at quotes (rounded) of $2,149,000 and $2,859,000. The third bid, by Newport News, offered completion in 28 days for $1,806,249 or completion in 50 days for $1,668,000. Lykes immediately accepted the $1,668,000 bid, and the MASON LYKES promptly departed for Newport News. While the repairs were not actually completed until June 14, the vice president of maintenance and repair testified that the Newport News facility could have finished its work by May 29 if Lykes had insisted upon timely completion. Likewise repairs could have been completed within 28 calendar days had Lykes accepted the alternative higher bid.
 
 
 19
 When Lykes informed the cargo owners that the voyage was terminated, most accepted the offer to reship on April 25 aboard the HOWELL LYKES. One cargo owner utilized the RUTH LYKES and another the ZOELLA LYKES which left Galveston on June 6. Each was required to pay full freight for the voyage of the MASON LYKES before Lykes would release the cargo for resumed shipment. Each was also required to pay full freight a second time for the voyage which finally delivered the cargo to the Far East.
 
 
 20
 Under these circumstances, we conclude that Lykes' unilateral decision to abandon the voyage and retain the freight was not an exercise of reasoned judgment having due regard for the interests of the cargo, and it was not an "endeavor to hold the balance evenly between ship and cargo when their interests conflict." The only information which Lykes had at the time of the decision to abandon was an oral report on the extent of damages, the estimate of the vice president of maintenance and repair based on his personal experience that repairs would take approximately 60 days, and the fact that the MASON LYKES was committed to a time charter with the Military Sea Lift Command in June. Lykes had no input from the cargo interests. By waiting a very few more days, detailed information on repairs and repair time would have been available. At that point, a meaningful response from cargo could have been solicited. The bids demonstrated that repairs could be made within 28 days under one of the options submitted by the lowest bidder. The 28-day bid would have cost approximately $140,000 more than the lowest option which called for repairs in approximately 50 days.
 
 
 21
 We conclude that it was incumbent upon Lykes to ask the cargo interests whether they would consider a 30-to-60-day delay unreasonable. Lykes' ex parte assumption that the cargo interests would consider that delay unreasonable was ill-founded. To avoid a portion of the 60-day delay cost the cargo owners nearly $700,000. In considering unreasonable delay, Lykes should have considered only the delay to cargo already loaded, not cargo not yet lifted. The latter cargo interests were free to ship on other vessels without incurring a liability to Lykes even if Lykes had decided to continue the voyage after repairs. Furthermore, consistent with its obligation "to hold the balance evenly between ship and cargo," Lykes should have considered the possibility of continuing the voyage, under the second paragraph of clause 10 of the bill of lading, by transferring the cargo to the HOWELL LYKES without charging a full second freight.
 
 
 22
 The record persuades us that Lykes' actions were not motivated primarily or even equally by its concern for the interests of the cargo owners. By abandoning the voyage, Lykes was able to keep the entire freight charges, earn another freight charge by shipping in another of its bottoms and keep its charter with the government. Had Lykes continued the voyage after repairs, it would have been required to breach its charter with the government or substitute another of its vessels for the MASON LYKES. Had Lykes opted to transfer the cargo to the HOWELL LYKES under clause 10, no double freight charge could have been collected. It was to the maximum advantage of Lykes and the maximum disadvantage of the cargo interests that the voyage be abandoned in the manner in which it was done.
 
 
 23
 A decision to continue the voyage in the HOWELL LYKES, under clause 10, would have resulted in no more delay than was actually experienced, and no more cost of shipment. If the decision had been made to accept the 28-day bid, the delivery time would have been only slightly extended,[7] and the costs to Lykes would have been relatively modest.[8] Either decision would have reflected the mandated concern for the cargo interests.
 
 
 24
 Further, the factor of "abandonment as a consequence of the carrier's fault" is relevant to our determination. The district court found the MASON LYKES 90% at fault for the collision. This militates heavily against a finding that the decision to abandon the voyage and retain full freight was reasonable.
 
 
 25
 In sum, Lykes did not contact the shippers and inquire whether they would rather incur a delay of two to six weeks or an additional shipping charge of approximately $700,000 (see footnotes 7 and 8). Lykes merely presumed the latter. We find a patent disregard of the interest of the cargo, contrary to the prevailing rules and contract of carriage.
 
 
 26
 Recovery from Amoco: The District Court's Ruling that
 
 Robins Dry Dock Precludes Recovery
 
 27
 Ten percent of the fault for the collision was apportioned to the AMOCO CREMONA. Although the acts for which the court faulted that vessel are admittedly only slight deviations from proper navigational procedures, we cannot say that the assessment is clearly erroneous.
 
 
 28
 Citing Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), the district court held that the cargo interests could not recover freight damages from the owners of the AMOCO CREMONA because freight losses are purely economic losses and a victim who does not suffer physical damage to property is precluded from recovering economic losses. We disagree with the district court's finding that Robins Dry Dock mandates the disposition of this case. We also disagree with the court's distinguishing of Aktieselskabet Cuzco v. The SUCARSECO ("The TOLUMA"), 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942 (1935). We conclude that the facts at bar are more nearly akin to the facts in The TOLUMA than to the facts in Robins Dry Dock and its progeny.
 
 
 29
 In Robins Dry Dock a vessel was negligently damaged by employees of a dry dock while undergoing ordinary maintenance. The damage to the vessel delayed its return to service. The vessel was subject to a charter. Although the charter suspended the charter hire while the vessel was in dry dock, the time charterer sued the dry dock for damages resulting from loss of use of the vessel during the damage-induced extension. Justice Holmes, writing for a unanimous court, denied recovery, stating that "a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong." 275 U.S. at 309, 48 S.Ct. at 135. This circuit and others have interpreted Robins Dry Dock to mean that there can be no recovery for economic losses caused by an unintentional maritime tort absent physical damage to property in which the victim has a proprietary interest. Our most recent expression is State of Louisiana ex rel. Guste v. M/V TESTBANK, 752 F.2d 1019 (5th Cir.1985) (en banc).[9]
 
 
 30
 In The TOLUMA a collision occurred between the TOLUMA and the SUCARSECO as a result of the fault of both vessels. Both vessels were damaged, but the SUCARSECO was able to continue her voyage. While the TOLUMA was too badly damaged to proceed without repairs, her cargo was not physically damaged[10] and she put into port. Part of her cargo was unloaded and stored to permit necessary repairs. After the repairs, the TOLUMA continued her voyage. A clause in the bill of lading gave the owners of the TOLUMA the right to collect the cost of unloading, reloading, and storage from the cargo interests despite the fact that the costs were incurred as a result of the owners' partial fault in the collision. The innocent cargo interests in turn sought to recover the money paid to the owners of the TOLUMA from the owners of the other negligent non-carrying vessel. In allowing the cargo interests to recover, the Supreme Court stressed the common adventure nature of the relationship between the vessel owner and the cargo interests. The Court also noted that the expenses in question were expenses arising directly from the collision, expenses for which the negligent non-carrying vessel would have been liable even in the absence of a general average right by the vessel owners against the cargo interests:
 
 
 31
 That the extraordinary expenses, thus shared, were due to the collision cannot be gainsaid. It is because they were thus directly caused, that these expenses form part of the damages to be divided between the two vessels. On this basis they were included in the decree for division made by the District Court and the propriety of the inclusion of these amounts in the total damages to be divided between the vessels is not questioned. But the right to that inclusion springs directly from the tort and in that relation no question is raised as to proximate cause or foreseeable consequences.
 
 
 32
 The nature of these expenditures and the fact that they are traceable directly to the collision are not changed by the sharing in general average. That merely affects the distribution of the loss, not its cause. The claim of the cargo owners for their general average contributions is not in any sense a derivative claim. It accrues to the cargo owners in their own right. It accrues because of cargo's own participation in the common adventure and the action taken on behalf of cargo and by its representative to avert a peril with which that adventure was threatened. Being cargo's own share of the expense incurred in the common interest, the amount which is paid properly belongs in the category of damage which the cargo owners have suffered by reason of the collision. The ENERGIA (D.C. [1894] 61 F. 222 (C.C.A.2d [1895] 66 F. 604, 608.
 
 
 33
 * * *
 
 
 34
 * * *
 
 
 35
 As we have said, the "Jason clause" merely distributed a loss for which Sucarseco was responsible and in that view the cargo owners are entitled to recover that part of the loss which they have sustained.
 
 
 36
 294 U.S. at 403-05, 55 S.Ct. at 470-71. Chief Justice Hughes, writing for a unanimous court, distinguished Robins Dry Dock, observing:
 
 
 37
 This is not a case of an attempt, by reason of "a tort to the person or property of one man," to make the tortfeasor liable to another "merely because the injured person was under a contract with that other, unknown to the doer of the wrong." See Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 309, 72 L.Ed. 290, 292, 48 S.Ct. 134 ; Elliott Steam Tug Co. v. The Shipping Controller [1922] 1 K.B. 127, 139, 142--C.A.; The FEDERAL NO. 2 (C.C.A.2d) 21 F. (2d) 313. Here, cargo as well as ship was placed in jeopardy. That jeopardy was due in part to the negligence of the vessel against which the claim is made. The fact that the vessel and the cargo under the "Jason clause" bear their proportionate shares of the expenses gives Sucarseco no ground for a contention that the expenses themselves, or the share that cargo bears, were not occasioned directly by the tort. In the light of the nature of the general average contributions, and of the event which made them necessary, the fact that they were made under the stipulation in the "Jason clause" is no more a defense to Sucarseco than is the fact that the cargo was placed on board under a contract to carry it.
 
 
 38
 294 U.S. at 404-05, 55 S.Ct. at 471.
 
 
 39
 The common adventure concept is a venerable one and is firmly established. Reflecting on vintage cases, the authors of Benedict on Admiralty observe, almost in passing, that "upon stowage of the cargo ... hull and cargo [are] bound together in a venture." 2A Benedict on Admiralty, Sec. 35, at 4-17 (6th Ed.1985).
 
 
 40
 The bills of lading in this case indicate that the voyage of the MASON LYKES was a common adventure between the vessel and cargo owners similar to the participants in the voyage of the TOLUMA. The instant bills of lading contain a "Jason clause"[11] similar to the clause under which the owners of the TOLUMA passed along the expenses of unloading, loading, and storage to the cargo interests. The purpose of the Jason clause is to spread the risks among all participants in the venture. The TOLUMA. The freight earned clause under which the cargo interests in this case were obligated to pay Lykes also supports the common adventure nature of the voyage for freight earned clauses were also developed to spread the risks between common adventurers in ocean transportation. As the district court observed in 9655 Long Tons, No. 2 Yellow Milo: "The prepaid freight clause involved here was developed to require the cargo owner to share with the vessel owner to some extent the inherent risks of ocean transportation...." 238 F.Supp. at 574. Thus the terms of the bills of lading support the proposition that the owners of the MASON LYKES and the owners of her cargo were engaged in a common venture. That common venture sustained physical injury when the AMOCO CREMONA collided with the MASON LYKES. It cannot be gainsaid that the damages in this case, lost freight, are similar to the costs of unloading, reloading, and storage in The TOLUMA; they, too, are damages arising directly from the collision for which the negligent non-carrying vessel would have been liable even in the absence of a freight earned clause. The BALTIMORE, 75 U.S. (8 Wall.) 377, 19 L.Ed. 463 (1869).
 
 
 41
 Robins Dry Dock is inapposite for another reason. In the absence of a freight earned clause, Lykes would not have had the right to retain the freight. Alcoa Steamship Co. v. United States. When a collision causes a vessel to lose freight by preventing delivery of the cargo to its final destination, the cargo-carrying vessel can recover the lost freight from the negligent non-carrying vessel. The BALTIMORE. Thus the loss of the original freight for the voyage would be an economic loss of the owner of the damaged vessel. Robins Dry Dock does not prevent recovery for such economic losses by the owner of the physically damaged vessel. See Vicksburg Towing Co. v. Mississippi Marine Transport Co., 609 F.2d 176 (5th Cir.1980); State of Louisiana ex rel Guste v. M/V TESTBANK; Venore Transportation Co. v. M/V STRUMA, 583 F.2d 708 (4th Cir.1978). Nor does Robins Dry Dock prevent recovery for such losses by a person to whom they have been contractually shifted. Standard Navigazione v. K.Z. Michalos, 1981 A.M.C. 748 (S.D.Tex.1981); Venore Transportation Co. v. M/V STRUMA. Nothing in the Robins Dry Dock or the TESTBANK holding or rationale prohibits recovery in tort by the person to whom the economic losses suffered by the owner of physically damaged property have been shifted. The effect of a freight earned clause is similar to the effect of a clause providing that charter hire continues to run while a vessel is disabled; it contractually shifts the risk of economic loss, which would normally fall upon the property owner, to a third party. That third party is entitled to recover those losses. The risk of double recovery from the tortfeasor is not extant. STRUMA.
 
 
 42
 The spectre of runaway recovery lies at the heart of the Robins Dry Dock rubric. As Professors Prosser and Keeton noted in their most recent work:
 
 
 43
 The policy against recovery based on negligence is rooted at least in part on what Professor James has called the "pragmatic objection," that while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, or by contract, or by other business planning devices.
 
 
 44
 Prosser & Keeton on the Law of Torts (5th Ed.1984), Sec. 129, p. 1001, citing James, Tort Liability for Economic Loss, 1972, 25 Vand.L.Rev. 43, 45.
 
 
 45
 The claim against Amoco by the cargo owners is in the nature of an equitable subrogation of Lykes' rights. So viewed, there would be no double recovery, much less runaway recovery. As the professors again observed, "subrogation recoveries involve only one loss ... there is no potential in such cases for a chain of recoveries...." Id. at 999.
 
 
 46
 The instant case is not within the parameters of the evil to be remedied. There is no danger of an unlimited round of recoveries. The cargo owners make no attempt to recover for remote contractual losses or real or speculative lost profits. Rather, they seek only to recover, with and through the vessel, those actual, out-of-pocket expenses they incurred which were directly occasioned by the collision. But for the freight earned clause, Amoco would have been liable exclusively to Lykes. As a consequence of the freight earned clause, the claim is transferred to the cargo owners and may be asserted by them under the umbrella of this equitable principle. See Compania Anonima Venezolana de Nav. v. A.J. Perez Export Co., 303 F.2d 692 (5th Cir.1962), and other authorities cited therein.
 
 Collection of Damages
 
 47
 The cargo interests are entitled to recover their damages from either Lykes or Amoco, for they have a valid cause of action against both. Because Lykes' decision to abandon the voyage was unreasonable, the cargo interests are entitled to recover the full amount of retained freight on the voyage of the MASON LYKES from Lykes. T.J. Stevenson & Co. v. 81,193 Bags of Flour. The cargo interests are also entitled to recover the entire amount of the forfeited freight. The TOLUMA. However, they may recover only once. If the cargo interests collect full damages from Amoco, Amoco in turn may include these costs in the apportionment of the damages between the vessels. See The TOLUMA and United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). If the cargo interests collect full damages from Lykes, Lykes may include the lost freight in the apportionment of the damages between the vessels. The BALTIMORE; United States v. Reliable Transfer Co.
 
 
 48
 Accordingly, we REVERSE and REMAND to the district court for the determination of the amount of freight actually paid by the cargo interests for the aborted voyage of the MASON LYKES and to enter judgment for the appellants in that amount, together with any interest deemed appropriate, and costs.
 
 
 
 [1]
 Clause 10 of the bill of lading reads:
 In any situation whatsoever and wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the Carrier is likely to give rise to risk of capture, seizure, detention, damage, delay or disadvantage to or loss of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to commence or continue the voyage, the Carrier may before or after loading, require the shipper or other person entitled thereto to take delivery of the goods at port of shipment, and upon failure to do so, may warehouse the goods at the risk and expense of the goods; or at any time, whether or not proceeding toward or entering the port of discharge, may discharge the goods into depot, lazaretto, craft, or other place; or may proceed or return, directly or indirectly, to or stop at any port or place whatsoever as the master or the Carrier may consider safe or advisable under the circumstances, and there discharge the goods; or may retain the goods on board until the return trip or until such time as the Carrier thinks advisable and discharge the goods at any place whatsoever; or may discharge and forward the goods by any means. The Carrier is not required to give notice of discharge or forwarding, and when the goods are discharged, as herein provided, they shall be at their own risk and expense; such discharge shall constitute complete delivery under this contract and the Carrier shall be freed from any further responsibility. For any services rendered to the goods as hereinabove provided, the Carrier shall be entitled to a reasonable extra compensation. If, in following the procedure permitted herein, the length or duration of the voyage is increased, shipper and/or consignee shall pay proportionate additional freight, all of which shall constitute a lien on the goods.
 Carrier is expressly authorized, at its sole discretion, for any purposes whatsoever, and without notice, to transfer the goods from the vessel named herein to another or to others or to arrange alternative means for carriage to destination, or temporarily to remove the cargo from the ship, or to substitute other vessels; and any such transfers, movements, or substitutions, shall be deemed to be within the contract voyage, and not a deviation therefrom.
 
 
 [2]
 Most of the cargo was reshipped aboard the HOWELL LYKES which left Galveston on May 5. The cargo from two of the bills of lading was reshipped on other Lykes vessels, the RUTH LYKES and the ZOELLA LYKES, which departed Galveston on June 6
 
 
 [3]
 Clause 16 of the bill of lading provides:
 Freight shall be payable on actual gross intake weight or measurement or, at Carrier's option, on actual gross discharge weight or measurement. Freight may be calculated on the basis of the particulars of the goods furnished by the shipper herein but the Carrier may at any time open the packages and examine, weigh, measure and value the goods. In case shipper's particulars are found to be erroneous and additional freight is payable, the goods shall be liable for any expense incurred for examining, weighing, measuring and valuing the goods. Full freight shall be paid on damaged or unsound goods. Full freight hereunder to port of discharge named herein shall be considered completely earned on shipment whether the freight be stated or intended to be prepaid or to be collected at destination; and the Carrier shall be entitled to all freight and charges due hereunder, whether actually paid or not, and to receive and retain them irrevocably under all circumstances whatsoever ship and/or cargo lost or not lost or the voyage broken up or abandoned. In case of forced abandonment or interruption of the voyage for any cause, any forwarding of the goods shall be at the risk and expense of the goods. All unpaid charges shall be paid in full and without any offset, counterclaim or deduction in the currency of the port of shipment, or, at Carrier's option, in the currency of the port of discharge at the demand rate of New York exchange as quoted on the day of the ship's entry at the Custom House of her port of discharge. The Carrier shall have a lien on the goods, which shall survive delivery, for all charges due hereunder and may enforce this lien by public or private sale and without notice. The shipper and the consignee shall be jointly and severally liable to the Carrier for the payment of freight and all charges and for the performance of the obligations of each of them hereunder.
 
 
 [4]
 A number of cases have held that a carrier may not avail itself of the benefit of a freight-earned clause where the reason for abandonment of the voyage resulted from the fault of the carrier. See Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp., 306 F.2d 188 (9th Cir.1962); Silva v. Bankers Commercial Corp., 163 F.2d 602 (2d Cir.1947); Mitsubishi Shoji Kaisha Ltd. v. Societe Purfina Maritime, 133 F.2d 552 (9th Cir.1942); Mediterranean Agencies, Inc. v. Rethymnis & Kulukundis Ltd., 185 F.Supp. 34 (S.D.N.Y.1960); The LAURENT MEEUS, 43 F.Supp. 807 (S.D.Calif.1942). The district court, citing one case, In re Complaint of Compania Naviera Epsilon, S.A., 1974 A.M.C. 2608 (S.D.N.Y.1973), distinguished these cases on the ground that the fault involved was not negligence in the management or navigation of the vessel. The court a quo and the district court in In re Complaint of Compania Naviera Epsilon, S.A. reasoned that barring collection of freight under a freight-earned clause where the voyage was abandoned because of navigational negligence on the part of the vessel would conflict with the policy of the Carriage of Goods by Sea Act (COGSA), which relieves a carrier from responsibility for loss or damage arising from navigational negligence. We are not persuaded by this reasoning. In the absence of a contractual provision, a carrier may not collect freight if it fails to deliver the goods. Alcoa Steamship Co. v. United States. COGSA does not change this principle. Prior to COGSA, the carrier was liable for loss or damage to the goods caused by navigational negligence. COGSA changed this rule but provided that the carrier may not limit its responsibility for the results of its own negligence except as allowed by the Act. 46 U.S.C. Sec. 1303(8). Since COGSA does not give the carrier the right to collect freight when it fails to deliver the goods, any clause in the bill of lading permitting the collection of freight despite failure of delivery because of the carrier's negligence, is an impermissible limitation of the carrier's responsibility. Such a clause would be similar to the "both-to-blame clauses" which allowed a carrier to recover from the cargo interests the amount it paid another vessel in reimbursement of the sums paid cargo by that vessel when damages to cargo resulted from the mutual fault of both vessels. In United States v. Atlantic Mutual Insurance Co., 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed.2d 907 (1952), the Supreme Court declared such clauses contrary to the policy of COGSA. We conclude that fault on the part of the carrier is a relevant factor in determining the reasonableness of the decision to abandon the voyage and retain the freight even if that fault involves negligence in the navigation or management of the vessel
 
 
 [5]
 See, e.g., Robicheaux v. Radcliff Material, Inc., 697 F.2d 662 (5th Cir.1983) (employee status); N.L.R.B. v. L.B. Priester & Son, Inc., 669 F.2d 355 (5th Cir.1982) (statutory refusal to bargain); Guidry v. Continental Oil Co., 640 F.2d 523 (5th Cir.1981) (seaman status)
 
 
 [6]
 The record does not indicate exactly when the decision to abandon was made. It may have been made as early as April 4, the earliest of the dates suggested for the meeting to consider the effects of the vessel damage on the voyage
 
 
 [7]
 The HOWELL LYKES left Galveston on May 5. Had the 28-day contract been accepted, the MASON LYKES would have left Galveston on May 23. This time estimate allows five days for the trip to the shipyard (the time actually required), the 28 days of repair, five days for the return trip, and three days for reloading
 
 
 [8]
 The total freight charged for shipment of the cargo loaded in New Orleans aboard the MASON LYKES was $691,921.38. All of this cargo was reshipped aboard Lykes' vessels at similar charges. The 50-day repair bid accepted was approximately $140,000 less than the 28-day bid
 
 
 [9]
 But see State of Louisiana ex rel. Guste v. M/V TESTBANK, 752 F.2d at 1027 n. 10. See also Barber Lines A/S v. M/V DONAU MARU, 764 F.2d 50 (1st Cir.1985)
 
 
 [10]
 See 72 F.2d 690, 691 (2d Cir.1934)
 
 
 [11]
 Clause 15 of the bill of lading reads in part:
 In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract, or otherwise, the goods, the shipper, the consignee, and the owners of the goods, jointly and severally, shall contribute with the Carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or ships belonged to strangers.