**CHANNEL STAR EXCURSIONS, INC., Plaintiff–Appellant,**

v.

**SOUTHERN PACIFIC TRANSPORTATION COMPANY, a corporation, Defendant–Appellee.**

No. 94–16648.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 4, 1995.

Decided Feb. 14, 1996.

James H. Vernon, San Ramon, California, for the plaintiff-appellant.

Michael L. Johnson, Southern Pacific Law Department, Rancho Cordova, California, and Cindy A. Gannon, Johnson, Mitchell & Gannon, Sacramento, California, for the defendant-appellee.

* Honorable Gordon Thompson, Jr., United States District Judge, Southern District of California,

Before: WALLACE, Chief Judge, THOMPSON, Circuit Judge, and THOMPSON,* District Judge.

WALLACE, Chief Judge:

Channel Star Excursions, Inc. (Channel Star) brought an action against Southern Pacific Transportation Co. (Southern Pacific) based on several theories of injury all relating to Southern Pacific's delay or failure to open its swingbridge. The district court dismissed the action for failure to state a claim. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

I

Southern Pacific owns and operates the "I Street Bridge," a swingbridge which spans the Sacramento River, connecting the cities of Sacramento and West Sacramento. Channel Star owns two vessels, the "Matthew McKinley" and the "Spirit of Sacramento," which it operates as excursion and dining riverboats. Channel Star alleges that on 93 occasions Southern Pacific failed to open or unreasonably delayed opening the swingbridge, thereby disrupting Channel Star's cruises and hurting its business. Channel Star brought its action under the Bridge Act of 1906 (Act) and under general maritime tort law.

II

The Act, 33 U.S.C. §§ 491–498, imposes certain duties upon bridge owners and operators, who may suffer fines and/or imprisonment for failing to open bridges promptly. The Secretary of Transportation is authorized to promulgate regulations for bridges and to assess fines for deficient operators. 33 U.S.C. § 499. Channel Star argues that the Act also provides an implied private claim to those aggrieved by willful or negligent failure to open a drawbridge.

We determine whether there is an implied claim under the Act by analyzing whether: (1) Channel Star is one of the class

sitting by designation.

for whose especial benefit the statute was enacted; (2) there is an indication of congressional intent; (3) a private claim would further the Act's underlying scheme; and (4) the action is traditionally relegated to state law so as to make a federal private claim inappropriate. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). The "ultimate issue is whether Congress intended to create a private right of action." *California v. Sierra Club,* 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981) (*Sierra Club* ). In *Thompson v. Thompson,* 484 U.S. 174, 189, 108 S.Ct. 513, 521, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring), it was suggested that the first, third, and fourth *Cort* points have been overruled, with the second point—the existence of congressional intent—being completely determinative.

The majority of circuits that have addressed the issue have held there is no implied private claim under the Act. *See Williamson Towing Co. v. Illinois,* 534 F.2d 758, 762 (7th Cir.1976); *Intracoastal Transportation v. Decatur County,* 482 F.2d 361, 365–66 (5th Cir.1973); *Red Star Towing & Transportation Co. v. Department of Transportation,* 423 F.2d 104, 106 (3d Cir.1970). On the other hand, the Fourth Circuit has held there is such a private claim. *Chesapeake Bay Bridge and Tunnel District v. Lauritzen,* 404 F.2d 1001, 1003–04 (4th Cir.1968).

■ We agree with the district court and follow the majority of circuits to conclude that the Act provides no private claim. The first two *Cort* issues weigh against a private claim. There is no express authorization nor have the parties pointed to any legislative history which would suggest that Congress intended a private claim. In addition, there is nothing in the statutory text that would indicate that Congress would place Channel Star, as a pleasure cruise operator, in an "especial class." Instead, the Act speaks of benefits to the public at large. *See* 33 U.S.C. § 494 ("if there be difficulty in passing the draw opening or the drawspan of such bridge by rafts, steamboat, or other water craft"). These first two *Cort* points are dispositive. *Sierra Club,* 451 U.S. at 297, 101 S.Ct. at 1781. We may end our inquiry here.

However, we should pause to discuss one of our prior cases, in which we opined that the Act creates an implied claim. *See Riggle v. California,* 577 F.2d 579 (9th Cir.1978) (*Riggle* ). *Riggle* interpreted *Alameda Conservation Association v. California,* 437 F.2d 1087, 1094–95 (9th Cir.), *cert. denied,* 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 649 (1971), to have created an implied private claim under the Rivers and Harbors Appropriation Act. *Riggle,* 577 F.2d at 582–83. We stated that "it seems reasonable to conclude that ... a private cause of action [exists] under the Rivers and Harbors Appropriations Act, if not also under the Bridge Act of 1906." *Id.* at 583. We held, however, that Eleventh Amendment immunity barred the action, *id.* at 583 n. 4, and therefore never ruled on the question of an implied claim under the Act. The statement concerning the Act is obviously dicta, and may be disregarded. *Kennedy v. Collagen Corp.,* 67 F.3d 1453, 1458 (9th Cir.1995).

Indeed, even that dicta has been subsequently undermined by the Supreme Court. Since *Riggle,* the Court has ruled that the Rivers and Harbors Appropriations Act does not contain an implied private claim. *Sierra Club,* 451 U.S. at 297–98, 101 S.Ct. at 1781–82. The reasoning in *Riggle* equates the two acts. Largely relying on the private claim supposedly found in the Rivers and Harbors Appropriations Act, it suggests that the Act has an implied private claim. Because the Supreme Court has specifically ruled that there is no implied private claim under the Rivers and Harbors Appropriations Act, *Riggle* 's conclusion is questionable. In addition, *Riggle* 's like treatment of the two acts, combined with the Court's holding in *Sierra Club,* supports the result we reach here.

III

■ Channel Star also asserts that maritime tort law provides a claim to remedy its injuries. This assertion, however, runs afoul of an established doctrine in maritime tort law that disallows recovery in tort for economic damages without actual physical injury to person or property. *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) (prohibiting recov-

ery in the maritime field for purely economic loss unaccompanied by physical damage); *see* 8 *Benedict on Admiralty* § 16.03[D] at 16–37 (1995). This rule has been strictly followed in the First, Second, Third, Fourth, Fifth, and Eleventh Circuits. *See, e.g., Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50 (1st Cir.1985).

 We, on the other hand, have made limited exceptions. In *Carbone v. Ursich,* 209 F.2d 178, 181–82 (9th Cir.1953), relying on the notion that seamen are the favorites of admiralty law, we allowed recovery for lost profits resulting from negligent fouling of fishermen's nets which were full of fish. In *Union Oil Co. v. Oppen,* 501 F.2d 558 (9th Cir.1974), we did not apply the *Robins Dry Dock* rule in the context of damage to fish and the marine ecosystem due to oil spills. We stated that oil drillers "are under a duty to commercial fisherman to conduct their drilling and production in a reasonably prudent manner as to avoid the negligent diminution of aquatic life." *Id.* at 570. We limited our ruling so as not to "open the door to claims that may be asserted by those, other than commercial fishermen, whose economic or personal affairs were discommoded.... The general rule [that of *Robins Dry Dock* ] urged upon us by defendants has a legitimate sphere within which to operate." *Id.* We were silent on the exact contours of this "legitimate sphere."

We will not extend this exception, if it be one, to the case at hand. We did not make it clear in *Union Oil* whether we relied on maritime or California tort law. We stated that "[f]or this reason we are content to say that for purposes of this case we regard it as irrelevant whether our efforts are designated as an exposition of admiralty law or the law of California." *Id.* at 563. Thus, our *Union Oil* opinion cannot be read as a wholehearted shift in admiralty law doctrine. *See id.* at 571 (Ely, J., concurring). More important, by its own terms, *Union Oil* is limited to the environmental sphere; if it is under admiralty law, it can only be said to have carved out a unique exception to the *Robins Dry Dock* rule by placing a duty on oil drillers to fish and the marine ecosystem. Moreover, we have never applied *Union Oil* outside of these limited facts, *see, e.g., Jones v. Bender Welding & Machine Works,* 581 F.2d 1331, 1337 (9th Cir.1978), nor do we believe we should.

Because we conclude that there is no claim in maritime tort for economic damages without actual physical injury, we need not reach Southern Pacific's assertion that the Act's remedies displace maritime common law.

AFFIRMED.