NAUTILUS MARINE, INC., an Alaska corporation, Avalon Leasing, Inc., a Washington corporation; Erling Carlson; and Larry Gray, Plaintiffs,

v.

James R. NIEMELA and Jane Doe Niemela, husband and wife, in personam; John "Porter" O'Hara and Jane Doe O'Hara, husband and wife, in personam; Ocean Beauty Seafoods, a Washington corporation, in personam; and the M/V Norquest, Official No. 609064, her engines, tackle, equipment, apparel and appurtenances, in rem, Defendants.

No. A95–364–CV (JWS).

United States District Court, D. Alaska.

Sept. 16, 1996.

George. H.G. Yates, Bullivant Houser, et al., Seattle, WA, for plaintiffs.

James W. Talbot, Bauer Moynihan & Johnson, Seattle, WA, for defendants.

### ORDER FROM CHAMBERS

SEDWICK, District Judge.

### I. MOTIONS PENDING

At Docket 26, defendant John "Porter" O'Hara ("O'Hara") moves for partial summary judgment dismissing the claims asserted by plaintiff Nautilus Marine, Inc. ("Nautilus Marine") for economic losses. The motion joins and incorporates by reference the motion for summary judgment filed by defendant Ocean Beauty Seafoods, Inc. ("Ocean Beauty").

At Docket 31, plaintiffs Nautilus Marine, Avalon Leasing, Inc., Erling Carlson, and Larry Gray ("plaintiffs") oppose and move to continue O'Hara's motion. Alternatively, plaintiffs move to strike the motion on the ground that it is "procedurally infirm." No party has requested oral argument, and it would not be of material aid to the court.

### II. FACTS

On September 19, 1995, plaintiffs filed a complaint in admiralty, alleging, in pertinent part, as follows: Nautilus Marine is in the salmon tendering and processing business and operates tenders from Valdez, Alaska. On May 5, 1994, Nautilus Marine entered into a tender charter agreement with Erling Carlson ("Carlson"), owner of the F/V TOR, and Larry Gray ("Gray"), skipper of the TOR. The agreement was intended to include the 1994 Prince William Sound commercial salmon fishing season. During the same summer, Nautilus Marine and Avalon Leasing, owner of the F/V TRADITION, operated the TRADITION under a tender charter agreement that also was intended to include the 1994 Prince William Sound fishing season. Pursuant to these agreements, Carlson, Gray, and Avalon Leasing were to receive a per-pound compensation based on the amount of salmon tendered by the vessels during the summer of 1994, with a minimum seasonal compensation guarantee of $60,000.

On July 16, 1994, while the TOR and the TRADITION were moored along-side the

Valdez City Dock, the F/V NORQUEST struck the vessels, damaging the TRADITION and incapacitating the TOR. The complaint raises claims: (1) against all defendants for negligence; (2) against O'Hara (skipper of the NORQUEST) and James R. Niemela (owner of the NORQUEST) for punitive damages for reckless, wanton and/or willful misconduct; (3) against all defendants for vessel unseaworthiness; and (4) against O'Hara and Niemela for failure to provide, maintain, and supervise an adequate crew. The claims are not based on negligent or intentional interference with contractual relations. Rather, the complaint alleges that defendants negligently maintained the NORQUEST and negligently, recklessly, or intentionally caused the allision.

Ocean Beauty filed a cross-complaint against Niemela, alleging that Ocean Beauty had an oral daily charter agreement with Niemela, whereby Ocean Beauty chartered the NORQUEST for use as a fill-in tender, and pursuant to which Niemela agreed to indemnify, hold harmless, and protect it from any liabilities, obligations, and losses arising out of any litigation related to the performance of the daily charter agreement. On April 11, 1996, Ocean Beauty filed a motion for summary judgment against plaintiffs, arguing that Ocean Beauty was a non-demise charterer and, thus, did not assume ownership, and that Nautilus Marine's claims for economic losses should be dismissed on the ground that it did not have a proprietary interest in either vessel. On April 17, 1996, O'Hara filed a similar motion for partial summary judgment, incorporating Ocean Beauty's arguments and seeking to dismiss Nautilus Marine's claim for $290,693.18 in economic losses.

The amount of $290,693.18 reflects the damages asserted in Exhibit A to Ocean Beauty's summary judgment motion and includes the following: (1) $36,120.59 in lost harvest and profits from the Eshamy District in Prince William Sound for July 18–20, 1994, due to inability to timely repair or adequately replace the TOR; (2) $49,093.81 in lost harvest and profits from the Eshamy District for July 21–23 and July 28–29, 1994, due to continuing mechanical difficulties from dam-

ages on the TOR; (3) $173,704.42 in lost harvest and lost harvest profits from the Eshamy District for August 1–30, 1994, due to lost loyalty/market share of fishermen; (4) $8,212.12 in lost harvest and profits from the Coghill District for July 25–26, 1994; and (5) $23,062.24 in lost value on pink salmon and pink salmon roe for July 18, 1994 (Docket 26; Robert J. Adolph affidavit).

On June 6, 1996, pursuant to stipulations by all parties except O'Hara, the court dismissed with prejudice all claims between plaintiffs and Ocean Beauty, on condition that O'Hara's motion continued to incorporate by reference the arguments Ocean Beauty had advanced in its summary judgment motion. This order addresses O'Hara's adoption of Ocean Beauty's argument that, because Nautilus Marine holds no proprietary interest in the damaged property, its claim for economic loss is barred as a matter of law.

### III. DISCUSSION

#### A. Summary Judgment Standards

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

> [T]he plain language of 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

> To withstand summary judgment, the non-moving party (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more

persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. v. San Francisco Auto Indus. Welfare Fund,* 882 F.2d 371, 374 (9th Cir.1989); *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

### B. Robins Dry Dock

■ "This case poses the conundrum which arises when 'the defendant commits a tort causing physical harm to A which also results in an interference with B's contract rights without actually causing physical harm to B.'" *Mathiesen v. M/V OBELIX,* 817 F.2d 345, 346 (5th Cir.1987), *cert. denied, sub nom Unimills B.V. v. Statistix Shipping, N.V.,* 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 192 (1987) (quoting *Prosser and Keeton on the Law of Torts,* § 129, p. 997 (5th ed.1984)). General federal maritime law prohibits recovery in tort for economic damages absent physical injury to person or property. *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927) (denying recovery to time charterer of vessel who sued for profits lost when defendant dry dock negligently damaged vessel's propeller, causing extension of vessel's time in dry dock).

"The question is whether the [charterers] have an interest protected by the law against unintended injuries inflicted upon the vessel by third persons who know nothing of the charter." *Robins Dry Dock,* 275 U.S. at 308, 48 S.Ct. at 135. The answer is based on the reasoning that "[a] tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong." *Id.,* 275 U.S. at 309, 48 S.Ct. at 135 (citation omitted). *See also In re Glacier Bay,* 865 F.Supp. 629 (D.Alaska 1991); *In re Exxon Valdez,* 767 F.Supp. 1509 (D.Alaska 1991).

"*Robins* broke no new ground but instead applied a principle, then settled both in the United States and England, which refused recovery for negligent interference with 'contractual rights.'" *State of Louisiana ex rel. Guste v. M/V TESTBANK,* 752 F.2d 1019, 1022 (5th Cir.1985) (en banc). Reasons for the rule include:

(1) the variable nature of contractual relations, (2) the fear of undue burdens on defendant's freedom of action, (3) the probable disproportion between damages recoverable and the extent of defendant's fault and (4) the defendant's inability to foresee all possible plaintiff's having contracts with the victims of their torts. Implicit in the Robins Dry Dock rule is a recognition that a limit must exist to a tort feasor's liability for the potential "snowball effect" of his negligence on the rest of the world.

*Consolidated Aluminum Corp. v. C.F. Bean Corp.,* 1984 WL 2621 at *3 (W.D.La.); Restatement (Second) of Torts § 766C, cmt a (1977).

As one court has noted, "[t]he spectre of runaway recovery lies at the heart of the *Robins Dry Dock* rubric." *Amoco Transport Co. v. S/S MASON LYKES,* 768 F.2d 659, 669 (5th Cir.1985). Quoting *Prosser and Keeton on the Law of Torts,* the *Amoco* court pointed out that "while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, or by contract, or by other business planning devices." *Id.,* 768 F.2d at 669; Prosser & Keeton at § 129, p. 1001.

Like every rule, the rule in *Robins Dry Dock* has exceptions. These exceptions are discussed below.

### C. Intentional Misconduct

#### 1. Intentional Interference with Contract

■ Several courts have held that the rule in *Robins Dry Dock* does not apply when the damage was caused not by negligence, but by intentional interference with plaintiff's contractual relations.[1] *See, e.g., Getty Refining*

---

1. As the Court stated in *Robins Dry Dock:*

The damage was material to them only as it

and Marketing Co. v. MT Fadi B, 766 F.2d 829, 831 (3d Cir.1985); Dick Meyers Towing Serv., Inc. v. United States, 577 F.2d 1023, 1025 (5th Cir.1978), cert. denied, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); Kaiser Aluminum & Chem. Corp. v. Marshland Dredging Co., 455 F.2d 957 (5th Cir. 1972); CXY Energy, Inc. v. Jurisch, 1992 WL 211649 (E.D.La.1992). To prevail on such a claim, plaintiffs must establish that defendants intentionally interfered with plaintiffs' contractual relations and that defendants had knowledge of those obligations. Kaiser, 455 F.2d at 957.

■ Plaintiffs seek to extend the exception to any intentional tort, such that they need not establish that defendant knew of the contract. To do so, however, would inappropriately blur the bright line drawn in Robins Dry Dock and would defeat the Court's pragmatic way of avoiding a "chain reaction" of economic injuries that "may produce an unending sequence of financial effects." One example of the consequences of blurring the distinction will suffice to suggest the lack of wisdom inherent in doing so: If the rule were modified, the results would be that the tortfeasor who intentionally collides with a cruise ship would be liable to each entertainer scheduled to perform during the period while the ship is laid up for repairs and liable to each passenger who had purchased a non-refundable airplane ticket he could not use because of the ship's delay in reaching port. Because Nautilus Marine has provided no evidence that O'Hara knew of the charter agreements between Nautilus Marine and the vessels, absent any other exception, the rule in Robins Dry Dock precludes Nautilus Marine from recovering damages against O'Hara.

**2. Continuance**

Plaintiffs move to continue O'Hara's motion, pursuant to Fed.R.Civ.P. 56(f), on the grounds that, despite diligent efforts, they have been unable to discover facts relevant to the level of culpability at issue because they have not had the benefit of discovery responses from the NORQUEST's captain and crew; it took plaintiffs several months to locate and serve O'Hara, it took O'Hara a long time to secure counsel, O'Hara continues to remain unavailable for his deposition, and his counsel does not return plaintiffs' counsel's telephone calls.

Rule 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

A Rule 56(f) motion requires affidavits setting forth particular facts expected from the movant's discovery, and establishing why the additional discovery would preclude summary judgment and why the party cannot immediately provide specific facts demonstrating a genuine issue of material fact. United States v. One 1985 Mercedes, 917 F.2d 415, 418 (9th Cir.1990); Mackey v. Pioneer Nat'l Bank, 867 F.2d 520, 523–24 (9th Cir.1989); Hancock v. Montgomery Ward Long Term Disability Trust, 787 F.2d 1302, 1306 n. 1 (9th Cir.1986).

Plaintiffs submit the affidavit of Roy Milton, who witnessed the incident and describes it in such a way that might lead one to infer the allision was intentional. Plaintiffs also submit the affidavit of their counsel, George H.G. Yates, who avers that he has made diligent but unsuccessful efforts to con-

---

caused the delay in making the repairs, and that delay would be a wrong to no one except for the petitioner's contract with the owners. The injury to the propeller was no wrong to the respondents but only to those to whom it belonged. But suppose that the respondent's loss flowed directly from that source. Their loss arose only through their contract with the owners—and while intentionally to bring about a breach of contract may give rise to a cause of action, no authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong. The law does not spread its protection so far.

Id., 275 U.S. at 308–09, 48 S.Ct. at 135 (citations omitted).

duct the discovery necessary to decipher the mental state of O'Hara and his crew at the time of the alleged allision. In their supplemental opposition, plaintiffs offer a videotape of the incident, as well as the affidavit of Thomas D. Laing, Jr., an experienced operator, surveyor, repairer, and manager of marine vessels, whose review of the videotape of the allision and the facts associated therewith led him to conclude that the allision was likely the result of an intentional, reckless, or at least a grossly negligent act.

Even without the evidence plaintiffs seek to obtain through further discovery, they have provided sufficient evidence to establish a disputed question of fact as to whether the allision was caused by negligence or by the intentional, reckless or grossly negligent conduct of defendants. However, plaintiffs have provided no indication, through affidavit or otherwise, that with more time they might obtain evidence that O'Hara intentionally interfered with the contract between Nautilus Marine and the other plaintiffs. Therefore, in light of the court's conclusion that the exception to *Robins Dry Dock* for intentional misconduct is limited to cases where plaintiffs have alleged intentional interference with contractual relations, plaintiffs' motion for a continuance is denied.

### D. General Average Contributions

 The Supreme Court has established an exception to the rule in *Robins Dry Dock* where plaintiff is a cargo owner and has sued the non-carrying vessel for general average contributions it paid to the carrying vessel. *Aktieselskabet Cuzco v. The Sucarseco* ("The TOLUMA"), 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942 (1935).

> General average is an equitable doctrine in maritime law applicable when the vessel incurs extraordinary expense "to avert a peril that threatens the entire voyage." In such circumstances, "the party suffering the loss has a right ... to claim contribu-

tion from all who participate in the venture," including the cargo interests. *Ceramic Corp. of America v. Inka Maritime Corp.*, 1 F.3d 947, 948 (9th Cir.1993) (quoting Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 16–1, at 522–23 (1987)) [2]. The law of general average applies only when there is: (1) a danger in which ship, cargo, and freight are all at risk, which is imminent and inevitable; (2) a voluntary jettison of some portion of the joint concern for the purpose of avoiding the peril; and (3) success in saving the voyage. G. Gilmore & C. Black, *The Law of Admiralty* 244–47 (2d ed.1975).

In *The Toluma*, the cargo vessel and defendant's vessel collided, due to both vessels' negligence. The Court held that plaintiff cargo owners were entitled to recover for their general average contribution, because the cargo owners' right was not derivative but, rather, arose directly from its own risk at sea because of its participation in a common venture. *The Toluma*, 294 U.S. at 404, 55 S.Ct. at 471.

Interpreting *The Toluma*, the Fifth Circuit has stated:

> It is well-settled that when two ships collide, the owners of cargo on one ship may proceed in tort directly against the other, non-carrying ship. The rule has been applied even when the cargo did not suffer any immediate physical damage in the collision. This rule is founded on the notion of a "common venture," according to which ship and cargo share by law in certain of the risks, rights, and responsibilities of a voyage; the law of general average is the context in which the "common venture" concept most often arises.

*Cargill, Inc. v. Doxford and Sunderland, Ltd.*, 785 F.2d 1296, 1297 (5th Cir.), *reh'g denied*, 785 F.2d 1296 (1986) (citations omitted).

 Plaintiffs argue that the relationship between Nautilus Marine and the vessels,

---

**2.** General average is defined as:

Contribution by all parties in sea adventure to make good loss sustained by one of their number on account of sacrifices voluntarily made of part of ship or cargo to save residue, or for extraordinary expenses necessarily incurred by

one or more of parties for general benefit of all interested embarked in general enterprise. Henry Campbell Black, *Black's Law Dictionary* (5th ed.1979); *S .C. Loveland Co. v. United States*, 207 F.Supp. 450, 451 (E.D.Pa.1962).

TOR and TRADITION, was a "joint venture," such that Nautilus Marine has a direct claim against O'Hara for economic damages. Plaintiffs' argument proceeds as follows: Under the 1994 tender charter agreements, the TOR and the TRADITION were to purchase fish from fishermen designated by Nautilus Marine and to transport the fish to Nautilus Marine's Valdez processing plant. The vessels were compensated on a per-pound basis, with a minimum seasonal guarantee, and they provided transportation and relationship with the fishermen, while Nautilus Marine provided a network of fishermen to call upon and a market for resale. The charter agreements contain a Jason clause[3] requiring a general average contribution and a dovetailing Salvage clause, indicating that Nautilus Marine and the vessels anticipated sharing the risks and rewards of a joint venture.

■ O'Hara argues that Nautilus Marine had no proprietary interest in the vessels or the dock and that the tender arrangement between the vessels and Nautilus Marine was not a joint venture but, rather, a time charter for a flat seasonal rate with additional payments if the vessels delivered more than a certain minimum amount of fish.[4]

■ The two provisions in the charter agreement upon which plaintiffs rely state as follows:

3. A "Jason clause," requires a general average contribution that makes all participants in a maritime venture ratably responsible for losses incurred for their common good. *The Jason*, 225 U.S. 32, 55, 32 S.Ct. 560, 56 L.Ed. 969 (1912) (it is "no longer against the policy of the law" for the shipowner to contract with the cargo owners for a participation in general average contribution growing out of the negligence of the shipowner's master and crew).

The Jason clause obligates the cargo owner to contribute in general average to the payment of losses or expenses of a general average nature that may be incurred for the common benefit (i.e., in cases of danger, damage or disaster resulting from faults or errors in navigation or in management of the vessel), and the owner is required to exercise due diligence to make the vessel seaworthy and properly manned, equipped, and supplied. *See Aktieselskabet Cuzco v. Sucarseco*, 294 U.S. 394, 402, 403, 55 S.Ct. 467, 79 L.Ed. 942; *United States v. Los Angeles Soap Co.*, 83 F.2d 875 (9th Cir.1936) (upholding Jason clause).

14. *SALVAGE:* All Salvage and assistance to other Vessels to be for Owner's and Charterer's equal benefit after deducting Owner's and charterer's expenses and the Master's and crew's proportion.

15. *GENERAL AVERAGE:* General Average, if any, shall be adjusted in accordance with the law and usage of the port of anchorage. In case a General Average Statement is required, the same shall be adjusted by an Adjuster to be appointed by the Charterer, subject to approval of the Owner.

The charter agreement requires the owner to obtain all insurance, except the charterer is to obtain insurance to cover its own cargo. The agreement is not a demise charter and, although it endows the owner with responsibilities, including "the acquisition, preservation, transport and delivery of fish, and the loading and discharging thereof, as directed by Charterer, and with the utmost dispatch," the owner is an independent contractor, and the charterer "shall not exercise control over the particular activities of the vessel, master or crew"[5]

■ The relationship between Nautilus Marine and the other parties to the charter agreement does not embrace the notion of "common venture" shown by the parties in *The Toluma*.[6] Nautilus Marine is not suing

4. "Under a time charter the owner retains the management and control of the vessel, but the charterer designates the ports of call and the cargo carried. Each bears the expense related to his function: the charterer pays for the fuel to operate the vessel, but the owner pays for the galley fuel; the owner furnishes the master and crew, but the master is under the orders of the charterer." F. Maraist, *Admiralty in a Nutshell* 50 (1988).

5. "The essence of the demise charter is that the owner surrenders possession and control of the vessel to the charterer, who then succeeds to many of the rights and obligations of the owner. Thus the demise charterer is sometimes called the owner *pro hac vice*." F. Maraist, *Admiralty in a Nutshell* 47 (1988).

6. *See also Cargill, Inc. v. Doxford and Sunderland, Ltd.*, 785 F.2d 1296, 1297 (5th Cir.), *reh'g denied*, 785 F.2d 1296 (1986) (because alleged negligence in repairing vessel's engine, ultimately causing delay in delivery of plaintiff's cargo,

for general average contributions resulting from damaged or undelivered cargo but rather, for lost harvest and profits due to inability to timely repair or adequately replace the TOR. Lost profits are not general average contribution. *Alders Int'l (Ships) Ltd. v. United States,* 1995 WL 251571 (S.D.N.Y.); *MASON LYKES,* 768 F.2d at 669 (finding *Robins Dry Dock* inapposite in part because there was no danger of unlimited recoveries; cargo owners made no attempt to recover for remote contractual losses or for real or speculative lost profits). Notwithstanding the Salvage Clause and the Jason Clause provided in the charter agreement, this court concludes that the damages Nautilus Marine seeks are not the type contemplated in *The Toluma* when it declined to apply the rule in *Robins Dry Dock.*

### E. Commercial Fishermen

■ The Ninth Circuit also has made limited exceptions to the rule in *Robins Dry Dock* for commercial fishermen. *See, e.g., Carbone v.. Ursich,* 209 F.2d 178, 181–82 (9th Cir.1953) (relying on notion that seamen are the favorites of admiralty law, court allowed crew of damaged fishing vessel to recover lost profits resulting from negligent fouling of fishermen's nets which were full of fish; claim was properly brought in name of damaged vessel's owner as fishermen's trustee); *Union Oil Co. v. Oppen,* 501 F.2d 558, 570 (9th Cir.1974) (refusing to apply *Robins Dry Dock* in context of damage to fish and marine ecosystem due to oil spills, because oil drillers owe commercial fishermen duty to conduct drilling and production in reasonably prudent manner).

Plaintiffs argue that, as commercial fishermen, O'Hara and his crew reasonably could foresee that damage to fishing tenders during the height of the fishing season could cause economic loss to the charterers and crew of those vessels. Plaintiffs point out that in *Union Oil,* 501 F.2d at 558, the Ninth Circuit created an exception to the rule in

occurred before the vessel was chartered to plaintiff and before plaintiff's cargo was loaded, "application of the 'common venture' notion would emasculate *Robins Dry Dock*"); *Mathiesen v. M/V OBELIX,* 817 F.2d 345 (5th Cir.1987), *cert. denied, sub nom Unimills B.V. v. Statistix*

*Robins Dry Dock* and held offshore oil drilling operators liable to commercial fishermen for the damages resulting from their (the operators') negligent acts, because it was reasonably foreseeable that the acts could harm the fishermen's economic interests.

Plaintiffs cannot be attempting to assert the "commercial fishermen exception," because it clearly does not apply; Nautilus Marine is not a commercial fisherman but, rather, is in the salmon tendering and processing business. In at least one case, fishbroker plaintiffs have argued that the fishermen exception should apply to fishbrokers, because they rely upon the sea's resources in the same ways and because, under state law, both groups are subject to the same extensive regulation of their trade.

All of the Ninth Circuit cases that have addressed this issue have refused to apply it to fishbrokers. Although the State regulations may make brokers and fishermen highly interdependent and subject to similar restrictions, that does not turn the brokers into fishermen. Every party to a commercial transaction is dependent upon those they deal with. This is not a sufficient basis for treating them identically. Particularly here, where the fishermen exception is intended to be a narrow exception carved out for "the favorites of admiralty."

*Slaven v. BP America, Inc.* 786 F.Supp. 853, 861 (C.D.Cal.1992).

Plaintiffs seek to extend *Union Oil* beyond the appellate court's intentions. In *Union Oil,* the court did not apply *Robins Dry Dock* in the context of damage to fish and the marine ecosystem due to oil spills, because oil drillers have a unique duty to commercial fishermen "to conduct their drilling and production in a reasonably prudent manner as to avoid the negligent diminution of aquatic life." *Channel Star Excursions, Inc. v. Southern Pacific Transp. Co.,* 77 F.3d 1135,

*Shipping, N.V.,* 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 192 (1987) (*Robins Dry Dock* precluded cargo owner from suing tortfeasor for economic damages arising out of collision with vessel chartered to carry cargo, prior to time cargo is loaded).

1138 (9th Cir.1996) (quoting *Union Oil,* 501 F.2d at 570).

> [The Ninth Circuit] limited [its] ruling so as not to "open the door to claims that may be asserted by those, other than commercial fishermen, whose economic or personal affairs were discommoded...." More important, by its own terms, *Union Oil* is limited to the environmental sphere; if it is under admiralty law, it can only be said to have carved out a unique exception to the *Robins Dry Dock* Rule by placing a duty on oil drillers to fish and the marine ecosystem. Moreover, we have never applied *Union Oil* outside of these limited facts, *see, e.g., Jones v. Bender Welding & Machine Works,* 581 F.2d 1331, 1337 (9th Cir.1978), nor do we believe we should.

*Channel Star,* 77 F.3d at 1138. Therefore, no other exception to the rule in *Robins Dry Dock* applies, and Nautilus Marine's claims against O'Hara must be dismissed.[7]

### IV. CONCLUSION

For the reasons set out above, the motion at Docket 26 is **GRANTED.** The motion at Docket 31 is **DENIED.**

---

**7.** Plaintiffs argue that O'Hara's motion is invalid because it simply incorporates Ocean Beauty's motion, which Ocean Beauty has agreed to strike. This argument is meritless, in light of the court's ruling at Docket 37.