CONTI CORSO SCHIFFAHRTS–GMBH & CO. KG NR. 2, Plaintiff,

v.

M/V "PINAR KAPTANOGLU", her engines, boilers, tackle, appurtenances, etc. in rem, Kaptanogludenizcilik Ve Tic. Ltd. and Haci Ismail Kaptanogluship Management and Trading Co., Ltd., Defendants.

Kaptanogludenizcilik Ve Tic. Ltd. and Haci Ismail Kaptanogluship Management and Trading Co., Ltd., Counterclaim Plaintiffs,

v.

M/V "YELLOW SEA", her engines, boilers, tackle appurtenances, etc., in rem, and Conti Corso Schiffahrts–GMBH & Co. KG NR. 2, in personam, Counterclaim Defendants.

Kaptanogludenizcilik Ve Tic. Ltd. and Haci Ismail Kaptanogluship Management and Trading Co., Ltd., Third–Party Plaintiffs,

v.

The M/V "SIBONATA", V. Ships (U.K.) Ltd., IMTT–Bayonne and/or International–Matex Tank Terminals, and Westport Petroleum, Inc., Third–Party Defendants.

No. 04 Civ. 1252(JGK).

United States District Court, S.D. New York.

Feb. 10, 2006.

Brent Z. Skolnick, Patrick F. Lennon, Tisdale & Lennon, LLC, New York, NY, for Plaintiff/Counter Defendant.

Stephen H. Vengrow, Patrick Michael Decharles, II, Cichanowicz, Callan, Keane, Vengrow & Textor, Susan Patricia Mahon, Cozen O'Connor, LLP, Kirk M.H. Lyons, Lyons & Flood, L.L.P., New York, NY, Timothy Semenoro, Fowler, Rodriguez & Chalos, Port Washington, NY, for Defendants/Counter Claimant/Third–Party Defendants.

Jeremy O. Harwood, Healy & Baillie, LLP, New York, NY, for Westport Petroleum, Inc.

Kipp Charles Leland, Daniel James McInerney, Jr., Hill, Rivkins and Hayden, New York, NY, for IMTT–Bayonne and/or International Matex Tank Terminals.

## OPINION & ORDER

KOELTL, District Judge.

This case arises out of a maritime collision between the M/V PINAR KAPTA-NOLGLU and the M/V YELLOW SEA in the Kill Van Kull Channel in Lower New York Harbor on February 15, 2004. The collision forced the YELLOW SEA off its course and into an allision with the stationary M/V SIBONATA, which was moored nearby. An allision is the impact of a moving vessel with a stationary vessel or other stationary object. At the time of the allision, the SIBONATA was under a voyage charter to Westport Petroleum, Inc. ("WPI"), and was preparing to discharge a cargo of fuel oil owned by WPI. As a result of the allision, the SIBONATA was damaged, which in turn forced WPI to incur extra barge demurrage and shifting expenses in discharging its cargo.

WPI, a third-party defendant in this case, has brought cross claims and counterclaims against the PINAR KAPTA-NOLGLU and its owner and operator, Kaptanogludenizcilik Ve Tic. Ltd. and Haci Ismail Kaptanogluship Management and Trading Co., Ltd. (collectively "PK"), and Conti Corso Schiffahrts–GMBH & Co. KG NR. 2 ("Conti Corso"), the owner of the YELLOW SEA. WPI's cross claims and counterclaims allege negligence and other torts, and WPI seeks recovery of the extra barge demurrage and shifting expenses that it incurred in discharging its cargo as a result of the allision. PK and Conti Corso now move pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing all of WPI's cross claims and counterclaims against them. For the reasons stated below, the motion is denied.

### I.

The following facts are undisputed unless otherwise noted. At approximately

3:00 a.m. on the morning of February 15, 2004, the PINAR KAPTANOGLU and the YELLOW SEA collided in the Kill Van Kull Channel in Lower New York Harbor. (PK's Local Rule 56.1 Stmt. ("PK's 56.1"), 1; WPI's Local Rule 56.1 Stmt. ("WPI's 56.1"), ¶ 1.) Upon colliding with the PINAR KAPTANOGLU, the YELLOW SEA then struck the SIBONATA, which was moored nearby. (PK's 56.1 ¶ 2; WPI's 56.1 ¶ 2.) The SIBONATA suffered damage to her No. 7 port ballast tank as a result of the allision, but no damage was suffered by its cargo. (PK's 56.1 ¶ 5; WPI's 56.1 ¶ 5.)

At the time of the allision, WPI was the voyage charterer of the SIBONATA and had approximately 275,000 barrels of fuel oil in the SIBONATA's cargo tanks at that time. (PK's 56.1 ¶¶ 6–7; WPI's 56.1 ¶¶ 6–7). The Voyage Charter Party agreement between WPI and the owners of the SIBONATA contains a "Jason clause" which provides:

> In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo . . . .

(WPI's 56.1 ¶¶ 18–19; PK's Counter Local Rule 56.1 Stmt. ("PK's Counter 56.1"), 18–19.) The Voyage Charter Party agreement also includes a "General Average clause" and a "Lightering clause" that makes WPI responsible for the cost of any lightering operation, even one ordered by "local requirements/governmental approv-al." (WPI's 56.1 ¶ 20; PK's Counter 56.1 ¶ 20.) "Lightering" refers to the use of barges in loading or unloading ships.

After the allision, the United States Coast Guard ordered, as a precondition to conducting any repairs to the SIBONATA, that a discharge plan be provided for Coast Guard review that included damage/stability calculations to ensure that stresses on the hull would not result in greater damage to the vessel. (WPI's 56.1 ¶¶ 13, 15; PK's Counter 56.1 ¶¶ 13, 15; Declaration of Dino Vafiades in Support of WPI's Opposition to PK's Motion for Summary Judgment dated June 6, 2005, at Exhibit 1.) Thereafter, WPI discharged some of its cargo into lightering barges. (WPI's 56.1 ¶ 14; PK's Counter 56.1 ¶ 14.) WPI claims that it and the owners of the SIBONATA jointly agreed to discharge some of the cargo in this manner, and that the decision was made in response to the Coast Guard's order. (WPI's 56.1 ¶ 14.) PK and Conti Corso deny that the exhibit relied upon by WPI shows any joint agreement or the reasons for the discharge. (PK's Counter 56.1 ¶ 14.) The parties also disagree as to whether the damage caused by the allision placed the SIBONATA and its cargo in jeopardy. (Memorandum in Support of the Summary Judgment Motion of the Pinar Kaptanoglu Defendants & Third Party Plaintiffs, at 7; WPI's Opposition to Motion for Summary Judgment, at 9.) Both parties agree, however, that WPI incurred the expense of hiring two barges used to receive the cargo that was discharged from the SIBONATA after the allision, and it is the cost of hiring these barges for removal of the oil that WPI seeks to recover in this action. (WPI's 56.1 ¶ 16; PK's Counter 56.1 ¶ 16.)

## II.

The standard for granting summary judgment is well established. Summary

judgment may not be granted unless the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo*, 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Gallo*, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v.*

*T.R.M. Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party must produce evidence in the record and may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993); *see also Scotto v. Almenas*, 143 F.3d 105, 114–15 (2d Cir.1998).

### III.

PK and Conti Corso move for summary judgment with respect to all of WPI's cross claims and counterclaims. They argue that because WPI's claims for recovery are for purely economic damages and do not allege any physical injury to cargo, they are barred by the maritime doctrine of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). In *Robins Dry Dock*, a vessel was negligently damaged while undergoing ordinary maintenance at a dry dock, which delayed the vessel's return to service. During that time, the vessel was subject to a charter, and the time charterer sued the dry dock for damages resulting from the loss of use of the vessel due to the delay. In denying recovery to the time charterer, the Supreme Court broadly held that in admiralty cases, the general rule is that "a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong." *Id.* at 309, 48 S.Ct. 134. *Robins Dry Dock* has generally been interpreted as establishing a bright line rule barring recovery for economic losses caused by an unintentional maritime tort absent physical damage to

property in which the victim has a proprietary interest. *See, e.g., Amoco Transport Co. v. S/S MASON LYKES,* 768 F.2d 659, 666 (5th Cir.1985). *Robins Dry Dock* has been applied in the Second Circuit. *See Fed. Commerce & Navigation Co., Ltd. v. The M/V MARATHONIAN,* 528 F.2d 907 (2d Cir.1975) (per curiam) (holding that *Robins Dry Dock* barred a time charterer's claim for loss of use that resulted from the chartered ship being laid up after a collision with the defendant's vessel); *Alldeers Int'l (Ships) Ltd. v. United States,* No. 94 CIV. 5689, 1995 WL 251571 (S.D.N.Y. April 28, 1995) (holding that the rule of *Robins Dry Dock* barred recovery of a cruise ship concessionaire's lost profits that resulted from the cancellation of cruises during repairs after an accidental grounding).

WPI counters that recovery is permitted in this case based on *Aktieselskabet Cuzco v. The Sucaresco (The Toluma),* 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942 (1935), which creates an exception to *Robins Dry Dock's* requirement of physical damage where a cargo owner was engaged in a "common venture" with the carrying vessel. In *The Toluma,* the Supreme Court held that a cargo owner, who was engaged in such a common venture, was permitted to recover for general average contributions that were incurred as a result of a collision between the carrying vessel and the defendant's vessel. *Id.* at 405, 55 S.Ct. 467.

There are few cases interpreting the applicability of the common venture exception. *The Toluma* case itself arose out of a collision at sea between the TOLUMA and the SUCARSECO. *Id.* at 398, 55 S.Ct. 467; *see also The Toluma,* 72 F.2d 690, 691 (2d Cir.1934). Both vessels were damaged, and both were found to be at fault. As a result of the collision, the TOLUMA was forced to seek a port of refuge for necessary repairs. To permit these repairs, part of her cargo had to be discharged, and then later reloaded. Although her cargo suffered no physical injury in the collision, it nonetheless was damaged due to the extra handling that was required in order to permit the repairs. The bill of lading between the cargo owners and the carrying vessel contained a "Jason clause" which made the cargo owners liable to the owners of the TOLUMA to contribute in general average for the costs of discharging, reloading, and storage, despite the fact that the costs were incurred as a result of the owners' partial fault in the collision.

As explained in *Nautilus Marine, Inc. v. Niemela,* 989 F.Supp. 1229 (D.Alaska 1996), general average "is an equitable doctrine in maritime law applicable when the vessel incurs extraordinary expense to avert a peril that threatens the entire voyage. In such circumstances, the party suffering the loss has a right ... to claim contribution from all who participate in the venture, including cargo interests." *Nautilus Marine,* 989 F.Supp. at 1234 (internal citations and quotation marks omitted). *Nautilus Marine* further notes that:

> General average is defined as: Contribution by all parties in sea adventure to make good loss sustained by one of their number on account of sacrifices voluntarily made of part of ship or cargo to save residue, or for extraordinary expenses necessarily incurred by one or more of parties for general benefit of all interested embarked in general enterprise.

*Id.* at 1234 n. 2 (internal citation omitted).

Although the cargo in *The Toluma* ultimately suffered some physical damage when it was discharged, it was not for that damage that the cargo owners sought recovery. Rather, the cargo owners sought to recover from the owners of the SUCARSECO the general average contributions

that the cargo owners had paid to the owners of the TOLUMA. In permitting the cargo interests to recover, the Supreme Court stressed the presence of a "common adventure" relationship between the cargo interests and the vessel owner:

> The claim of the cargo owners for their general average contributions is not in any sense a derivative claim. It accrues to the cargo owners in their own right. It accrues because of cargo's own participation in the common adventure and the action taken on behalf of cargo and by its representative to avert a peril with which that adventure was threatened. Being cargo's own share of the expense incurred in the common interest, the amount which is paid properly belongs in the category of damage which the cargo owners have suffered by reason of the collision.

*The Toluma*, 294 U.S. at 404, 55 S.Ct. 467.

After finding that the cargo interests and the vessel were engaged in a common venture, the Supreme Court explicitly distinguished its holding from that in *Robins Dry Dock*. Citing *Robins Dry Dock*, the Supreme Court noted "[t]his is not a case of an attempt, by reason of 'a tort to the property of one man,' to make the tortfeasor liable to another 'merely because the injured person was under a contract with that other, unknown to the doer of the wrong.'" *Id.* at 404, 55 S.Ct. 467. The Court instead found:

> Here, cargo as well as ship was placed in jeopardy. That jeopardy was due in part to the negligence of the vessel against which the claim is made. The fact that the vessel and the cargo under the "Jason clause" bear their proportionate shares of the expenses gives Sucarseco no ground for a contention that the expenses themselves, or the share that cargo bears, were not occasioned directly by the tort.

*The Toluma*, 294 U.S. at 404–05, 55 S.Ct. 467.

The Fifth Circuit Court of Appeals relied on *The Toluma* in deciding *Amoco Transport Co. v. S/S MASON LYKES*, 768 F.2d 659 (5th Cir.1985). In *MASON LYKES*, the MASON LYKES collided with the AMOCO CREMORA. Both vessels sustained damage, and the MASON LYKES was forced into port for repairs, although the cargo aboard the MASON LYKES was not physically damaged in any way. The vessel owner of the MASON LYKES estimated that repairs would take sixty days and unilaterally determined that such a delay would be unreasonable to the cargo interests. Consequently, the owner of the MASON LYKES decided to abandon the voyage pursuant to a clause in the bill of lading.

Despite abandoning the voyage, the vessel owner was entitled to keep the full freight charges paid by the cargo interests due to a "freight earned clause" in the bill of lading. A "freight earned clause" provides that full freight charges are completely earned upon shipment of cargo, rather than upon arrival and discharge, and that the vessel may retain the freight charges even if the voyage is interrupted, abandoned, or the cargo is lost. The effect of this provision is to shift the risk and expense of forwarding cargo, following forced abandonment or interruption of the voyage, from the vessel to the cargo owner. Because of this provision, the owners of cargo aboard the MASON LYKES were required to pay a second full freight charge for shipment once their cargo was transferred to a sister ship. The cargo interests subsequently brought suit, claiming that the decision to abandon the voyage was unreasonable, and they sought recovery for the second freight charge from both the MASON LYKES and the AMOCO CREMORA.

The Court of Appeals initially held that the cargo interests could recover the second freight charge from the owners of the MASON LYKES because the decision to abandon the voyage was unreasonable and contrary to the prevailing rules and contract of carriage. *Id.* at 665. The Court of Appeals then held that the cargo interests could also recover the second freight charge from the owners of the AMOCO CREMORA, the partially negligent non-carrying vessel. The Court of Appeals found that the cargo interests and the MASON LYKES were engaged in a common venture. The Court found that a common venture relationship existed because of the inclusion of the "Jason clause" and "freight earned clause" in the bill of lading, which have the effect of spreading the risks of common adventurers in ocean transportation. The Court of Appeals then held that the case was governed by *The Toluma,* rather than *Robins Dry Dock.* Because there was a common venture between the cargo interests and the vessel, and because the carrying vessel was damaged, the cargo interests could recover from the partially negligent non-carrying vessel for their damages arising directly from the collision. *Id.* at 668.[1]

In this case, a common venture relationship, similar to that between the parties in *The Toluma* and *MASON LYKES,* exists between WPI and the owners of the SIBONATA by virtue of the Voyage Charter Party agreement between them. WPI's Charter Party contains a "Jason clause" that contains nearly identical language to the one used by the parties in the bills of lading in *The Toluma* and *MASON LYKES.* Furthermore, the Charter Party also includes a "General Average clause." The purpose of these clauses is to spread the risks among the participants of the venture, and thus they are the hallmarks of a common venture relationship.

Like the cargo interests in *The Toluma* and *MASON LYKES,* WPI was the owner of cargo on board a damaged vessel. Similarly, like *The Toluma,* WPI incurred extra expenses due to a requirement that the cargo be discharged before repairs to the vessel could take place. Although the cargo in *The Toluma* was damaged by excess handling during discharge, while WPI's cargo suffered no physical damage, it was not for that physical damage that recovery was sought by the cargo interests in *The Toluma.* Indeed, the Supreme Court did not rely on the existence of that physical damage in finding that recovery was permitted. Similarly, the Fifth Circuit Court of Appeals found in *MASON LYKES* that physical damage to cargo is not a prerequisite in order to recover under the common venture exception.

PK and Conti Corso argue that this case is not like *The Toluma* because the cargo owners have not asserted a general average claim for their expenses. They also argue that these expenses are not properly construed as general average expenses.

These arguments are unavailing. In *The Toluma,* the Supreme Court stressed that it was the nature of the damages sought to be recovered that was dispositive, and not whether the cargo owners were seeking to recover amounts that they had contributed to general average. The Supreme Court stated: "[t]he nature of these expenditures and the fact that they are traceable directly to the collision are not changed by the sharing in general average. That merely affects the distribution of the loss, not its cause." *The Tolu-*

---

1. As a second rationale for its decision, the Court also noted that recovery was particularly appropriate because the damages claimed arose out of the "freight earned clause" which contractually shifted a risk of loss from the vessel to the cargo owner. *See MASON LYKES,* 768 F.2d at 668.

**450**

*ma,* 294 U.S. at 404, 55 S.Ct. 467. The Supreme Court also stated, "[t]he claim of the cargo owners for their general average contributions *is not in any sense a derivative claim.* It accrues to the cargo owners in their own right." *Id.* (emphasis added). Therefore, a cargo interest need not make a claim of general average in order to pursue a claim against a third party tortfeasor. Instead, the claimant need only show that the damages arose out of a general average "type" of event—one in which cargo and vessel are participating in a common venture and action is taken on behalf of the cargo to avert a peril with which that venture is threatened. *Id.*

Here, WPI and the SIBONATA were engaged in a common venture as evidenced by the inclusion of the "Jason clause" and "General Average clause" in the agreement between them. Further, it is undisputed that there was a "peril"—the parties are in agreement that there was an allision that damaged the SIBONATA to the extent that immediate repairs were required. The parties also agree that the Coast Guard ordered a discharge plan be provided before any repairs could take place. The parties disagree, however, as to whether WPI's actions in employing the lightering barges in discharging its cargo were taken pursuant to the Coast Guard order, and whether such actions were required to avoid a peril to the common venture. PK and Conti Corso dispute whether the SIBONATA and its cargo were in "jeopardy," and thus whether the venture was ever "threatened." WPI contends that the vessel was threatened and that the discharge of the cargo was necessary to raise the vessel. These are genuine issues of material fact that cannot be decided on a summary judgment motion. Because there are genuine issues of material fact to be tried, the motion for summary judgment must be denied.

## CONCLUSION

For the reasons stated above, the motion by PK and Conti Corso for summary judgment is **denied**.

**SO ORDERED.**